[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Kirkland,* Slip Opinion No. 2014-Ohio-1966.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-1966

THE STATE OF OHIO, APPELLEE, *v*. KIRKLAND, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Kirkland,* Slip Opinion No. 2014-Ohio-1966.]**

*Criminal law—Aggravated murder—Substantially prejudicial prosecutorial misconduct can be cured by the court's independent evaluation of the capital sentence—Death penalty affirmed.*

(No. 2010-0854—Submitted September 11, 2013—Decided May 13, 2014.)

APPEAL from the Court of Common Pleas of Hamilton County,

No. B-0901629.

_____

FRENCH, J.

{¶ 1} This is a death-penalty appeal of right.  Defendant-appellant, Anthony Kirkland, was convicted of the aggravated murder of two girls in Hamilton County between 2006 and 2009.  He was also convicted of the murder of two other women.

{¶ 2} On the first morning of trial, Kirkland voluntarily pled guilty to the murders of Mary Jo Newton and Kimya Rolison, as well as to two counts of abuse

of a corpse. The jury convicted Kirkland on all remaining charges, including aggravated murder with death specifications for the deaths of Esme K. and Casonya C., and recommended a sentence of death. The trial court accepted the recommendation and sentenced Kirkland accordingly.

{¶ 3} For the reasons explained below, we affirm Kirkland's convictions and sentence.

*The State's Evidence at Trial*

{¶ 4} On the night of May 3, 2006, around 11:00 p.m., 14-year-old Casonya C. left the home of her grandmother, Patricia C. She took her book bag, gym shoes, and cell phone with her. Her grandmother assumed Casonya meant to spend the night at her mother's house.

{¶ 5} Around midnight, Casonya called her friend, Tania H., from the front porch of her friend's house. Tania told Casonya she was already in bed and did not want to go out, so Casonya said she was going back home.

{¶ 6} After leaving Tania's house, as she headed for her grandmother's house, Casonya spoke on the phone with her boyfriend, Ra'Shaud B. The two were having an argument when suddenly the phone cut off. Ra'Shaud tried for three days to reach Casonya by telephone, but he never spoke to her again.

{¶ 7} The next morning, Casonya did not show up at school. Casonya's mother indicated that she had not seen her daughter, and calls to Casonya's cell phone went to voicemail.

{¶ 8} At approximately 1:30 p.m. on May 4, 2006, Patricia C. called the police to report that her granddaughter was missing.

{¶ 9} On May 9, 2006, city workers doing landscaping discovered a body underneath a pile of old tires. The body was located in a secluded wooded area, approximately ten feet down the hillside from the end of a dead-end road.

{¶ 10} The body was heavily charred and decomposed, so much so that the responding officer could not determine the race or gender of the body. The

front teeth had been recently knocked out. The only clothing on the body was a sock on one foot.

{¶ 11} Just beyond the end of the road, police found a burn pit, a charred site where they believed that the body was burned before it was dragged down the hillside and buried under the tires. And near the pit they found a long piece of timber, charred at one end, that appeared to have been used as a poker to stir the fire.

{¶ 12} The forensic pathologist was unable to do a rape examination because the pelvic area was almost completely charred. Investigators were also unable to look for DNA evidence under the victim's fingernails because the hands and forearms were completely charred.

{¶ 13} The body was positively identified as that of Casonya C. by comparison of dental x-rays.

{¶ 14} One month later, on June 15, 2006, the still hot and smoking remains of a second human body were found approximately 35 feet from the end of a dead-end street. The right foot was found 37 feet from the body. Tests indicated that the fire was started using either lighter fluid or paint thinner.

{¶ 15} The autopsy was unable to determine a cause of death but did demonstrate that the victim was already dead when the body was set on fire. The body was eventually identified as that of Mary Jo Newton by comparison of dental records.

{¶ 16} In the spring of 2008, skeletal remains of a third victim were discovered in a heavily wooded area at the end of another dead-end street. The bones were scattered, and the hands and feet were never found.

{¶ 17} The cause of death was a sharp-force injury to the neck caused by a cutting instrument. The bones showed traces of burning on the face, the front of the hip bones, and the thigh bones. A forensic anthropologist determined that the victim was most likely an African-American woman, probably between 30 and 55

years of age. However, the victim's identity remained unknown for nearly one year.

{¶ 18} On the afternoon of Saturday, March 7, 2009, 13-year-old Esme K. left her home to go jogging, wearing her iPod and a purple watch. Esme K.'s mother called 9-1-1 at 4:21 p.m. to report Esme missing.

{¶ 19} Police searched abandoned houses and nearby woods. Eventually, two canine-unit officers spotted a man, later identified as Anthony Kirkland, sitting underneath some fir trees in the nearby woods.

{¶ 20} The officers saw knives protruding from his left pants pocket, so they disarmed him and searched him. They found a purple watch and an iPod in his pockets. Etched on the back of the iPod were the words "Property of Esme [K]."

{¶ 21} The officers placed Kirkland in handcuffs. Kirkland initially gave his name as Anthony Palmore. He claimed that he had found the watch and iPod in the woods. The police read Kirkland his *Miranda* rights.

{¶ 22} Efforts to confirm his identity through police databases were unsuccessful, but after about 20 minutes, Kirkland gave his real name. As the search for Esme continued, police transported Kirkland to the police station.

{¶ 23} At around 3:00 in the morning, searchers found the body of Esme K. in the woods. She was naked except for her shoes and socks. Her body was propped up against a tree branch, with her arms crossed and her legs spread. Her groin, inner thighs, and left hand had all been severely burned.

{¶ 24} The official cause of death was asphyxiation due to ligature strangulation, confirmed by a fracture of the hyoid bone, ligature marks on the neck, and petechiae on her face consistent with a long struggle. There was also evidence of premortem trauma to Esme's vagina consistent with rape.

{¶ 25} Police found Esme's top a few days later in the parking lot of a nearby vacant building. The shirt had burn holes and had been cut open in the

4

front.  A trail of burnt clothing led police to a white plastic bag containing Esme's grey sweatpants and underpants.  The zipper pocket of the sweatpants was burned, but the underwear was not.

{¶ 26} Investigators took DNA samples from Kirkland's hands, his penis, and a stain on his boxer shorts, and in all three cases, DNA consistent with Esme's was found.  Partial shoe prints in the woods were consistent with the type of sneaker Kirkland wore at the time.

{¶ 27} On the morning of March 8, 2009, Detective Keith Witherell interviewed Kirkland.  Witherell had previously interviewed Kirkland on March 15, 2007, in connection with the homicides of Casonya and Mary Jo.  During the 2007 interrogation, Kirkland viewed a photograph of Casonya and said that he did not recognize her.  He admitted that he knew Mary Jo and that the nature of their relationship was sexual, but denied having anything to do with her death.

{¶ 28} In 2007, police had no forensic evidence tying Kirkland to the murders, no eyewitnesses, and no admissions from Kirkland.  Consequently, they were unable to arrest or charge him.

{¶ 29} The first March 2009 interview lasted over four hours.  A video recording of that interview was introduced into evidence and played for the jury.

{¶ 30} During that interview, Kirkland offered multiple, inconsistent versions of events.  At the outset, he professed confusion as to the reason for his arrest, telling officers that he thought they brought him in because of outstanding warrants relating to an altercation with his ex-girlfriend's current boyfriend and that he had no idea he was there because of the missing girl.

{¶ 31} He repeatedly denied seeing a young girl jogging (or anyone else) in the vicinity of the reservoir near where he was found.  He acted as if he did not even know the race of the missing girl.  And he professed surprise to learn that the

watch and radio,[1] which he continued to insist he stumbled upon while walking in the woods, belonged to the missing girl.

{¶ 32} After further questioning, Kirkland admitted meeting Esme at the reservoir and told detectives that he could take them to her. He said that the two literally ran into one another and that the collision caused Kirkland to drop his beer and lose his temper. He punched Esme multiple times and kicked her. But he claimed to have left her alive.

{¶ 33} After detectives told Kirkland that her body had been found, he changed his story. First claiming to have no memory of events, Kirkland then admitted chasing Esme into the woods. But he continued to claim that he left her injured but alive, and he repeatedly insisted that she was wearing clothes when he left her.

{¶ 34} As the questioning continued, Kirkland claimed to have left Esme alive with a man he knew only as Pedro. But when challenged, Kirkland confessed knowing all along that she was dead. He admitted that he had returned to the reservoir some hours after the murder to move the body.

{¶ 35} Kirkland said Esme died "because of my hatred." But when asked directly if he had killed her, he still said no, and as the interview concluded, Kirkland was still insisting that he had learned the location of the body from Pedro.

{¶ 36} A second interview of Kirkland began approximately two hours later. This time, Detective William Hilbert questioned Kirkland about Mary Jo and Casonya. The interview occurred in two sessions, the first lasting about two and one-half hours, and the second less than 90 minutes. Video recordings of those interviews were introduced into evidence, and a redacted version was played for the jury.

---

[1] What Kirkland initially called a radio was in fact Esme's iPod.

{¶ 37} Kirkland gave the following account of Mary Jo's murder:

{¶ 38} He first met Mary Jo at the bus stop across the street from the downtown Justice Center. She worked as a prostitute to support a drug habit. She was just getting out of the Justice Center when Kirkland met her. He and Mary Jo had sex together a couple of times.

{¶ 39} On the day she died, Kirkland picked her up in the College Hill area. They went to a liquor store together, then to a Rally's for food. They took some drugs. Next they went by the house of Kirkland's girlfriend, who was at work at the time.

{¶ 40} As they continued to drive, an argument broke out. Kirkland choked Mary Jo to death from behind. Then he drove to Avondale and dumped her body at the end of a dead-end street. He had a gas can in his vehicle that he used to set the body on fire. According to Kirkland, he burned the body because fire purifies and burning the body was "a proper burial" like the Vikings did. It was still daylight at the time, but no one was around, so Kirkland stayed to watch the flames.

{¶ 41} Hilbert shifted the conversation to Casonya, and Kirkland offered this account:

{¶ 42} He first saw Casonya at the top of a bridge that crosses Interstate 71 near Walnut Hills High School. It was around 1:00 in the morning. Kirkland was sitting smoking marijuana. He heard Casonya having an argument with somebody on her cell phone, and when she saw him smoking, she hung up the phone.

{¶ 43} According to Kirkland, Casonya asked him about the marijuana, he asked if she was old enough for that, and she answered she was old enough to be doing a lot of things.

{¶ 44} That led to a conversation in which Kirkland gave her $20 and agreed to go as high as $60. He says the money was to pay her just to talk. The

two had an argument about, according to Kirkland, "girls playing games." Casonya threw the money back at him. At that point, Kirkland got mad and grabbed Casonya. She kneed him, and he strangled her.

{¶ 45} Before the altercation, the pair had crossed the bridge together and descended to Victory Parkway. From there, Kirkland carried her dead body to a wooded area where he burned her, using lighter fluid he took from a nearby house. He then carried her burned body down the hill and covered the body with tires because he was scared. He stayed with the body all night long.

{¶ 46} Kirkland then offered the following account of Esme's murder:

{¶ 47} At around 3:00 in the afternoon, as he was walking near the reservoir, Esme ran into him. She was apologetic, which only enraged Kirkland. He punched her, called her names, and demanded to know her name and what music she was listening to. At some point, he chased her into the woods, she tripped over a small fence, and he continued to punch and choke her.

{¶ 48} At first, Kirkland denied raping Esme. But then he told Hilbert that Esme said that "she would do whatever I wanted, just don't hurt her," and he asked to have sex with her. However, he was unable to penetrate her completely, so he made her masturbate him manually. Then he choked her to death with his bare hands because he did not believe her when she said she would not tell anyone. In a subsequent interview, he elaborated that he had used a rag to strangle Esme when his efforts to kill her with his bare hands failed.

{¶ 49} He propped up her body against a tree and stayed for two hours talking to her, apologizing to her. Then he tried to start a fire using her clothes as an accelerant. It was dark when he left to find lighter fluid "to perform the ritual." He ate some food from a garbage can and eventually returned to the woods (but not the body), where he fell asleep until the police found him.

{¶ 50} A third interview of Kirkland—also shown to the jury— commenced 30 minutes later. In the interview, detectives asked him about the

unidentified burned body found in the spring of 2008. At first, Kirkland claimed to have killed only three victims. And then, after a great deal of discussion, Kirkland announced, "I, three—I wasn't honest totally. * * * It was one more."

{¶ 51} Kirkland knew her as Kim. She was working as a prostitute when he met her on Reading Road in December 2006. He paid her $40, and they had sex. As they continued to drive together, an argument broke out, and Kirkland pulled the car over. He stabbed Kim in the throat with her own knife. He dumped her body up a dead-end hill. He laid the body out on a bed of wood and sprayed it with lighter fluid, then covered the body. He returned a few weeks later, to find the skeleton still in place, but the leg bones missing.

{¶ 52} Police tried to identify those remains using information provided by Kirkland, including the fact that on the night she died, she and Kirkland had had an encounter with a uniformed police officer in Clifton who told them they could not be in a public park after dark. An investigator reviewed a month's worth of records showing license-verification requests sent by Cincinnati police to the state of California. The search revealed that on December 22, 2006, a police officer working in Clifton ran an inquiry on a California driver's license belonging to Kimya Bodi Iamaya Corrine Rolison, whose date of birth roughly matched the one Kirkland remembered seeing on her license. The Rolison family confirmed that Kimya was missing. Dental records confirmed the identity of the body.

{¶ 53} After the state finished playing the videotapes of Kirkland's confessions, and over the defense's objection, the state called Kylah W. to testify. Kylah testified that she was 13 years old in the fall of 2007. At the time, Kylah was living with her mother. Kirkland was a friend of her mother's who would sometimes stay with them.

{¶ 54} Kylah testified that on September 26, 2007, she arrived home from school at about 3:30 in the afternoon and found herself alone in the apartment

with Kirkland. Kylah was hungry, so she decided to cook herself a hamburger. She left the food cooking on low to go into her bedroom to talk to a friend on the telephone.

{¶ 55} According to Kylah, Kirkland knocked on her bedroom door, then opened the door, put the hamburger on top of her dresser, and left the room, closing the door behind him. Kylah continued her telephone conversation. But a short time later, Kirkland opened her door again, and this time his "bottoms" were down and his privates were exposed. Kirkland stood in the doorway without entering. Kylah repeatedly told him to get out of her room, which he eventually did.

{¶ 56} Five or ten minutes later, Kirkland returned again. He was still exposing himself. This time he was carrying a piece of paper, and he approached Kylah and held the paper so she could read it. The note read, "I want to be the first to eat you out and I'll pay you." Kylah continued telling him to leave, and Kirkland did.

{¶ 57} But he came to her room a fourth time. This time he was dressed. He walked into her room, placed five dollars on the dresser, and walked out.

{¶ 58} Unsure what to do, Kylah stayed on the phone with her friend for another ten minutes and then left the apartment. When she later told her mother what had happened, her mother told Kirkland to get out of the apartment, and then the two women went to the local police station to report the incident. Kirkland was eventually convicted of importuning and served about one year in prison, a fact the jury did not learn until the penalty phase.

*The Defense Case*

{¶ 59} The defense did not call witnesses during the guilt phase.

*Procedural History of the Case*

{¶ 60} On March 17, 2009, the state filed a 12-count indictment against Kirkland. The indictment included four counts of aggravated murder with death-

penalty specifications. Count Two charged Kirkland with the aggravated murder of Casonya C. while committing or attempting to commit rape, a death-penalty specification under R.C. 2929.04(A)(7), and Count Four charged Kirkland with the aggravated murder of Casonya C. while committing or attempting to commit aggravated robbery, R.C. 2929.04(A)(7). Counts Two and Four included "course-of-conduct" death-penalty specifications. R.C. 2929.04(A)(5).

{¶ 61} Counts Nine and Eleven contained rape and robbery aggravated-murder charges in connection with the death of Esme K. Each of these counts also included a course-of-conduct specification as well as an escape-detection-or-apprehension specification under R.C. 2929.04(A)(3).

{¶ 62} The indictment contained eight additional counts: Count One, attempted rape of Casonya; Count Three, aggravated robbery of Casonya; Count Six, murder of Mary Jo Newton; Count Eight, attempted rape of Esme K.; Count Ten, aggravated robbery of Esme K.; and Counts Five, Seven, and Twelve, gross abuse of a corpse.

{¶ 63} Kirkland was indicted separately for murder and abuse of a corpse relating to Kimya Rolison. Over objection, the two indictments were consolidated for trial.

{¶ 64} On the morning of trial, Kirkland voluntarily entered a plea of guilty to the murder and abuse-of-a-corpse charges relating to Mary Jo Newton and Kimya Rolison. On March 12, 2010, the jury found Kirkland guilty on all the remaining counts, including all the death-penalty specifications, and recommended a sentence of death. For purposes of sentencing, the court merged the escape-detection specifications with the specifications of felony murder while attempting rape or robbery. The court then sentenced Kirkland to death for the aggravated murder of Esme K. while committing or attempting to commit a rape and for the aggravated murder of Casonya C. while committing or attempting to

11

commit a robbery. The court also sentenced Kirkland to 70 years to life for the murders of Mary Jo Newton and Kimya Rolison.

*Legal analysis*

{¶ 65} Kirkland seeks reversal of his convictions of aggravated murder and the sentence of death in ten propositions of law.

**1.      The admission of Kylah W.'s testimony** (Proposition of Law I)

{¶ 66} In his first proposition of law, Kirkland argues that the trial court violated Evid.R. 404(B) by allowing Kylah W. to testify that when she was 13 years old, Kirkland exposed himself to her and offered her $5 to engage in oral sex.

{¶ 67} The trial court has broad discretion in the admission and exclusion of evidence, including evidence of other acts under Evid.R. 404(B). *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 22. Unless the trial court has "clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere" with the exercise of such discretion. *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967). We have defined "abuse of discretion" as an "unreasonable, arbitrary, or unconscionable use of discretion, or as a view or action that no conscientious judge could honestly have taken." *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23.

{¶ 68} Evid.R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may, however, be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). Similarly, R.C. 2945.59 allows the admission of other-acts evidence tending to show a defendant's "motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question."

Generally, evidence of other acts is admissible if it is offered for a purpose other than to prove the character of a person in order to show action in conformity with that character, Evid.R. 404(B), it is relevant when offered for that purpose, Evid.R. 401, and the danger of unfair prejudice does not substantially outweigh its probative value, Evid.R. 403. *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20.

{¶ 69} The trial court did not abuse its discretion by admitting Kylah's testimony. The state introduced the evidence of her encounter with Kirkland for a valid purpose other than proving character in order to show that he had acted in conformity with that character: to show that Kirkland offered money to Casonya not "just to talk" with her, as he told police, but that he had a sexual intent and motive for doing so. Nor did the trial court admit Kylah's testimony as proof of character. In fact, in its final instructions to the jury, the trial court told the jury that it could not consider evidence of any other acts for such a purpose. We presume that the jury followed this limiting instruction. *See id.* at ¶ 23. Kylah's testimony was relevant to the attempted-rape allegations involving Casonya because it tended to show a fact "of consequence," i.e., that Kirkland had a sexual interest in Casonya and a sexual purpose for approaching her. Evid.R. 401. Moreover, the attempted rape of Casonya was one of the only crimes the defense contested during the guilt phase, and Kylah's testimony was relevant to refute the defense's suggestion that Kirkland had an innocent purpose for offering Casonya money and that he did not have sex with her.

{¶ 70} Finally, the danger of unfair prejudice did not substantially outweigh the probative value of Kylah's testimony. The trial court reduced any danger of undue prejudice in its limiting instruction to the jury. *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 194 (limiting instruction "minimized the likelihood of any undue prejudice" caused by the admission of Evid.R. 404(B) evidence); *see also Williams* at ¶ 24. The only claim

of prejudice in Kirkland's brief is his conclusory statement that Kylah's testimony "made the difference between life and death," a statement that seems to refer to the outcome of the mitigation phase rather than the guilt phase. Kirkland supports this claim by citing two newspaper articles that contain posttrial statements from the prosecuting attorney and one victim's stepmother. These materials are not in the record, and we cannot consider them. *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus ("A reviewing court cannot add matter to the record before it, which was not part of the trial court's proceedings, and then decide the appeal on the basis of the new matter").

{¶ 71} We overrule Kirkland's first proposition of law.

**2.      Ineffective Assistance of Counsel** (Proposition of Law II)

{¶ 72} In his second proposition of law, Kirkland alleges two incidents of ineffective assistance of counsel. First, Kirkland alleges that his trial counsel told the jury in the mitigation-phase opening statement that an uncle would testify to explain why Kirkland's parents were not in attendance and why Kirkland should receive a sentence other than death. But the uncle was not called to the stand, and the jury was given no explanation in closing argument for the uncle's absence.

{¶ 73} The record does not show defense counsel making any such representation to the jury in an opening statement, either at the guilt phase or the mitigation phase. Defense counsel told *the judge* that a family member might testify but later reported that the family would not cooperate. Those statements were made outside the presence of the jury. The record does not support this allegation of ineffective assistance.

{¶ 74} The second alleged deficiency concerns the testimony of Kirkland's mitigation expert witness, Dr. Scott Bresler, a forensic psychiatrist, who testified that Kirkland is a psychopath. Dr. Bresler testified that psychopaths have reduced serotonin levels and that a low serotonin level is associated with impulsive aggression. On cross-examination, Dr. Bresler conceded that no brain

14

scans or chemical tests were performed on Kirkland. Kirkland now alleges that his counsel was ineffective for failing to arrange blood tests for possible lack of serotonin.

{¶ 75} To prove an allegation of ineffective assistance of counsel, a defendant must satisfy a two-prong test. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, he must establish that counsel's performance fell below an objective standard of reasonable representation. *Id.* at 687. And second, he must show that the deficient performance caused him prejudice. *Id.* A defendant can establish prejudice by showing a reasonable probability that but for counsel's errors, the result of the trial would have been different. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶ 76} Kirkland cannot prevail on this claim at this stage of the proceedings. To prove prejudice, he would need to show that the results of a serotonin test would support his case. In other words, he would need to supply proof outside the record, which this court cannot consider on direct appeal. *State v. Madrigal*, 87 Ohio St.3d 378, 390-391, 721 N.E.2d 52 (2000).

{¶ 77} We overrule Kirkland's second proposition of law.

**3.    Prosecutorial Misconduct** (Proposition of Law III)

{¶ 78} In his third proposition of law, Kirkland alleges prosecutorial misconduct in the course of penalty-phase closing arguments.

{¶ 79} Allegations of prosecutorial misconduct implicate due-process concerns, and the touchstone of the analysis is the " 'fairness of the trial, not the culpability of the prosecutor.' " *State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, at ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The test for prejudice in closing arguments, including penalty-phase closing arguments, is " ' "whether the remarks were improper, and, if so, whether they prejudicially affected substantial rights of the

defendant." ' " *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 83, quoting *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

**{¶ 80}** By the time the jury heard closing arguments in the penalty phase, Kirkland had already pled guilty to the murders of Mary Jo Newton and Kimya Rolison. In urging the jury to return a sentence of death for the other two murders, the prosecutor told the jury: "Finally, for the murder of Mary Jo and Kimya, which he admitted to before opening statements, he's going to jail for the rest of his life now. He's gone. *So I guess Casonya and Esme are just freebies for him—*" (Emphasis added.) The trial court did not sustain the defense's objection. Thereafter, the prosecutor stated, "Again, and I'll be very clear about this, [life in prison] should not be something you even consider, okay. He's going to jail on those other two for the rest of his life."

**{¶ 81}** According to Kirkland, the message to the jury was plain: if you do not return a recommendation of death, Kirkland will receive no punishment for two murders. Kirkland challenges these statements as improper.

**{¶ 82}** We agree. "[I]t is improper for a prosecutor to argue that a sentence less than death is meaningless and would not hold the defendant accountable for a victim's death when he is already serving a life sentence." *Hanson v. State*, 2009 OK CR 13, ¶ 24, 206 P.3d 1020. In capital-sentencing deliberations, the jury must weigh the aggravating and mitigating circumstances of the offense. But by suggesting that Kirkland would receive no punishment for killing Esme and Casonya unless the jury returned a verdict of death for their murders, the state asked the jury to set aside its proper assignment and return a recommendation of death based on improper considerations.

**{¶ 83}** We also find that the prosecutor's closing argument prejudicially affected Kirkland's substantial rights.

16

{¶ 84} For a prosecutor's closing argument to be prejudicial, the remarks must be "so inflammatory as to render the jury's decision a product solely of passion and prejudice." *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). To determine whether the remarks were prejudicial, the court must review the closing argument in its entirety. *State v. Slagle*, 65 Ohio St.3d 597, 607, 605 N.E.2d 916 (1992); *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980). Thus, the court must consider all of the prosecutor's remarks, irrespective of whether the defense preserved an objection. *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993) ("even though the defense waived objection to many remarks, those remarks still form part of the context in which we evaluate the effect on the jury of errors that were not waived").

{¶ 85} The objectionable statements in the state's closing argument fall into a number of categories.

*References to the subjective experiences of the victims*

{¶ 86} It is error for a prosecutor to invite the jury to consider what the victim experienced and felt in her last moments of life, because it improperly " 'invites the jury to speculate on facts not in evidence.' " *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 122, quoting *State v. Wogenstahl*, 75 Ohio St.3d 344, 357, 662 N.E.2d 311 (1996); *State v. Combs*, 62 Ohio St.3d 278, 283, 581 N.E.2d 1071 (1991). The state's closing argument employed this method on a number of occasions:

> What was it like for Casonya that night? It was dark, she's alone, and the only person escorting her is him. * * * What was it like for her then?
>
>     * * *
>
> [A]fter he confronts Esme on the back of that building, he talks about how she's cringing and he's calling her names. You're

nothing but a lying bitch, this little girl, 4-foot-11. What did that evoke in her?

And she's petrified.

* * *

What's this little girl going through naked in the woods except for her shoes and this little top? * * *

We know at some point she's actually vomiting on herself she's so terrified. * * * * * * [Y]ou saw all the scrapes and cuts and raw skin on her back and on her behind. She probably never even felt that because of the horrible pain between her legs at that point.

*Facts Outside the Record*

{¶ 87} A closing argument that goes beyond the record in order to arouse an emotional response in the jury may be prejudicial. *State v. Loza*, 71 Ohio St.3d 61, 78-79, 641 N.E.2d 1082 (1994). Although the prosecution is entitled to a degree of latitude in closing argument, it is improper for prosecutors to incite the jurors' emotions through insinuations and assertions that are not supported by the evidence and that are therefore "calculated to mislead the jury." *Smith,* 14 Ohio St.3d at 14, 470 N.E.2d 883.

{¶ 88} After graphically describing the strangulation of Esme, the prosecutor concluded by saying "she's not fighting anymore. She's not struggling. She just pounds her little hands on the ground and digs into the dirt. At that point she's no longer begging that man to let her live. *She's begging that man to let her die.*" (Emphasis added.) Nothing in the record supports the claim that Esme begged Kirkland to let her die.

{¶ 89} To generate jury sympathy for Casonya, the prosecutor said, "[Y]ou talk about tough childhoods. How about her? Her dad is in prison when

she's born. She hardly ever sees him. Her mom chose drugs over her little girl, and as a result she's brought up with some other brothers and sister and cousins by her grandma." None of this information is in the record. Casonya's grandmother, Patricia C., testified that she had custody of Casonya and two of her brothers "because the mother ran into problems and the children were placed with me." Patricia did not identify the nature of the problems, much less testify that Casonya's mother chose drugs over her daughter. Nor is there any testimony about the father being in jail or Casonya living with sisters or cousins.

*The "nature and circumstances" of the*
*murder as aggravating circumstances*

{¶ 90} While a prosecutor in the penalty phase of a capital trial may refer in closing argument to the nature and circumstances of the offense, that prosecutor may not " 'make any comment before a jury that the nature and circumstances of the offense are "aggravating circumstances." ' " *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 209, quoting *Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus; *see also State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 200.

{¶ 91} The state can describe the crime to prove the existence of the statutory aggravating factors. *Hale* at ¶ 199-200 (a prosecutor described the circumstances of the murder to prove that the defendant acted with prior calculation and design, which is a statutory aggravating circumstance); *Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, at ¶ 54 (the facts of the case were relevant to prove that the murder occurred while the defendant was in a prison); *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, at ¶ 93 (the state could properly have victims testify in the penalty phase about their experience to establish the course-of-conduct aggravating circumstance).

**{¶ 92}** The state may also argue the nature and circumstances of the offense to suggest that there is nothing mitigating about the circumstances of the offense. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 324; *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 79; *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 178-179. And, if the defense argues that the nature or circumstances of the crime is actually mitigating, the state may argue the nature and circumstances of the offense to rebut the defense's assertion. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 184; *State v. Smith*, 87 Ohio St.3d 424, 443-444, 721 N.E.2d 93 (2000).

**{¶ 93}** And finally, the state may argue the nature and circumstances of the aggravating offense to explain why the aggravating circumstances outweigh the mitigation evidence. *State v. Sheppard*, 84 Ohio St.3d 230, 238, 703 N.E.2d 286 (1998).

**{¶ 94}** But the state may not tell the decisionmaker that the nature and circumstances of the murder itself are the aggravating circumstances. *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 165-166. Nor can the prosecutor tell the jury to weigh the circumstances of the murder as aggravating circumstances against the mitigation evidence. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 189; *State v. Clemons*, 82 Ohio St.3d 438, 446-447, 696 N.E.2d 1009 (1998).

**{¶ 95}** In this case, the prosecution repeatedly urged the jury to weigh the specific details of the murder against the mitigation:

> [Kirkland] wants you to say, hey, I'm a psychopath, that outweighs what I did. It does just the opposite.
>
> And the last thing he tells us as he's choking the life out of that little girl and squeezing the last breaths out of her little body,

he says she's not fighting anymore. She's not struggling. She just pounds her little hands on the ground and digs into the dirt. At that point she's no longer begging that man to let her live. She's begging that man to let her die. And thankfully it ended for her.

*You'll never see a case with aggravating circumstances that weigh more or mitigation that weighs any less.*

\* \* \* \*

\* \* \* He takes a rag out of the back of his pocket. He twists it up and he slowly and methodically strangles Esme [K.] to death. She never fought. She dug her fingers into the dirt as she vomited and slowly died.

*Now, let's weigh that against the mitigation* that he is a psychopath and a self-proclaimed monster. Again, ladies and gentlemen, strike four, not even a close call.

(Emphasis added.) With these remarks, the state led the jurors to believe that they had to weigh the circumstances of the murder itself against the mitigation.

{¶ 96} In sum, we find that the state's closing remarks in the penalty phase were improper and substantially prejudicial. Accordingly, we conclude that Kirkland's third proposition of law is well taken.

{¶ 97} Nevertheless, we decline to remand the case for a new sentencing hearing. Pursuant to R.C. 2929.05(A), this court must conduct its own independent evaluation of the capital sentence, and that evaluation can cure errors in penalty-phase proceedings. *See, e.g., Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 131-132 (improper questions of a penalty-phase witness were cured by the independent sentence review); *State v. Sanders*, 92 Ohio St.3d 245, 267, 750 N.E.2d 90 (2001) (the independent review can cure a trial court's erroneous decision to exclude a witness, whose testimony had been

proffered, from the mitigation hearing). In *State v. Mills*, 62 Ohio St.3d 357, 373-374, 582 N.E.2d 972 (1992), for example, this court held that a prosecutor's sentencing argument was "clearly improper" but that the court's independent sentence evaluation would cure any prejudice the argument had caused.

{¶ 98} Accordingly, the issues raised in the third proposition of law will be cured by this court's review of the sentence, which will not consider the state's improper arguments.

**4.     "Automatic death" jurors** (Proposition of Law IV)

{¶ 99} In his fourth proposition of law, Kirkland claims ineffective assistance of counsel based on his trial counsel's alleged failure to weed out those jurors who would automatically vote for death without regard to mitigating factors. Kirkland asserts that his counsel performed only a "garden variety" felony-jury selection, rather than a specialized, specific, and focused voir dire.

{¶ 100} This proposition of law does not satisfy either prong of the *Strickland* test. Kirkland does not identify a question that his attorneys should have asked but did not, a question that they did ask but should not have, or a specific objection that they failed to raise. Therefore, we have no basis on which to conclude that his counsel's performance was deficient.

{¶ 101} Likewise, we have no basis on which to conclude that the manner in which defense counsel conducted voir dire resulted in prejudice. In fact, defense counsel did identify at least one "automatic death" member of the panel and successfully had that person removed for cause.

{¶ 102} We overrule Kirkland's fourth proposition of law.

**5.     The weight of mitigation evidence** (Proposition of Law V)

{¶ 103} In his fifth proposition of law, Kirkland challenges his sentence of death, given the alleged weight of mitigation. This presents an issue best addressed concurrently with the court's independent sentence evaluation, and we will discuss it in that context. *See Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677,

984 N.E.2d 948, at ¶ 211 (consideration of a challenge to a trial court's weighing of aggravating and mitigating factors deferred until the independent sentence evaluation).

**6.** **Constitutional challenges to the death penalty** (Proposition of Law VI)

{¶ 104} Kirkland's sixth proposition of law consists of nine subparts (some with multiple subheadings) challenging the constitutionality of Ohio's death penalty. The court has addressed most of these issues in previous cases.

*Subpart 1. "The death penalty is arbitrary and unequal punishment"*

{¶ 105} We have rejected each argument presented in Subpart 1 at least once:

{¶ 106} * *State v. Jenkins*, 15 Ohio St.3d 164, 169, 473 N.E.2d 264 (1984), citing *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (rejecting the claim that Ohio's death-penalty scheme is unconstitutional because it gives prosecutors unfettered discretion to indict);

{¶ 107} * S*tate v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 137, and *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 103 (both rejecting the claim that Ohio's death penalty is applied in a racially discriminatory manner);

{¶ 108} * *State v. Buell*, 22 Ohio St.3d 124, 136, 489 N.E.2d 795 (1986) (rejecting an equal-protection challenge based on the geographic disparity of death sentences); and

{¶ 109} * *Mink* at ¶ 103; *Jenkins,* 15 Ohio St.3d at 168, 473 N.E.2d 264 (rejecting the claim that the death penalty is unconstitutional because it is neither the least restrictive punishment nor an effective deterrent).

*Subpart 2. Ohio uses "unreliable sentencing procedures"*

{¶ 110} In *State v. Glenn*, 28 Ohio St.3d 451, 453, 504 N.E.2d 701 (1986), this court rejected the argument that allowing juries to weigh aggravating and

mitigating factors leads to arbitrary and capricious imposition of the death penalty.

*Subpart 3(A). Use of the same jury at trial and sentencing burdens*
*a defendant's rights to counsel and an impartial jury*

{¶ 111} This court rejected this argument in *State v. Mapes*, 19 Ohio St.3d 108, 116-117, 484 N.E.2d 140 (1985).

*Subpart 3(B). Ohio's death-penalty statutes unconstitutionally*
*fail to provide individualized sentencing because they*
*require proof of aggravating circumstances during the guilt phase*

{¶ 112} This court rejected this argument in *State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 88.

*Subpart 3(C). Ohio imposes an impermissible risk of death on capital*
*defendants who choose their right to trial because a trial judge,*
*in the interest of justice, may dismiss the death-penalty specification*

{¶ 113} This court rejected this argument in *State v. Van Hook*, 39 Ohio St.3d 256, 264, 530 N.E.2d 883 (1988).

*Subpart 3(D). R.C. 2929.04(B)(7) unconstitutionally allows*
*a sentencer to convert mitigation evidence into an aggravating factor*

{¶ 114} This court rejected this argument in *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 52-53.

*Subpart 4. R.C. 2929.04(A)(7) is unconstitutional because, by setting forth as*
*aggravating factors the same felony-murder specifications that distinguish*
*aggravated murder from murder, R.C. 2929.04(A)(7) does nothing to narrow the*
*class of persons eligible for the death penalty*

{¶ 115} This court rejected this argument in *State v. Henderson*, 39 Ohio St.3d 24, 28-29, 528 N.E.2d 1237 (1988).

*Subpart 5. R.C. 2929.03(D)(1) and 2929.04 are unconstitutionally vague*

{¶ 116} This court rejected a vagueness challenge to R.C. 2929.03(D)(1) in *State v. McNeill*, 83 Ohio St.3d 438, 453, 700 N.E.2d 596 (1998). We upheld R.C. 2929.04 in *State v. Chinn*, 85 Ohio St.3d 548, 567-568, 709 N.E.2d 1166 (1999).

*Subpart 6. The court's proportionality review is unconstitutional*

{¶ 117} This court summarily rejected this argument in *Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 207, and *Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, at ¶ 51.

*Subpart 7. Lethal injection is cruel and unusual punishment*

{¶ 118} Kirkland argues that lethal injection violates the Eighth Amendment to the United States Constitution. However, the United States Supreme Court has affirmed the constitutionality of lethal injection as a method of execution. *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). This court has reached the same conclusion. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 131; *State v. Carter*, 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000).

*Subpart 8. The death penalty violates Ohio's obligations under*
*international charters, treaties, and conventions*

{¶ 119} This court has addressed most, but not all, of these claims before. In *State v. Phillips*, 74 Ohio St.3d 72, 103-104, 656 N.E.2d 643 (1995), we held that capital punishment does not violate obligations owed under the American Declaration of the Rights and Duties of Man. We reaffirmed this holding as to the Declaration in *State v. Issa*, 93 Ohio St.3d 49, 69, 752 N.E.2d 904 (2001). And in *Short*, we rejected claims that the death penalty is barred by the International Covenant on Civil and Political Rights, the United Nations Covenant against Torture, and the international-law norm. 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, at ¶ 138, citing *Buell v. Mitchell*, 274 F.3d 337, 370-372 (6th

Cir.2001); *People v. Perry*, 38 Cal.4th 302, 322, 42 Cal.Rptr.3d 30, 132 P.3d 235 (2006); *Sorto v. State*, 173 S.W.3d 469, 490 (Tex.Crim.App.2005).

{¶ 120} However, we have not previously addressed the contention that Ohio's death-penalty scheme violates the International Convention on the Elimination of All Forms of Racial Discrimination or the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment of Punishment. But as noted above, we have repeatedly held that Ohio's death-penalty procedures are not unconstitutional or imposed in a racially discriminatory manner. *See, e.g., Short* at ¶ 137; *Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, at ¶ 103. And Kirkland "has not advanced any argument that these issues, as defined under international law, differ in any significant way from the constitutional arguments * * * already addressed, e.g., that equal protection and arbitrariness would be evaluated differently under international law than they are under the United States or Ohio Constitutions." *State v. Skatzes*, 2d Dist. Montgomery No. 15848, 2003-Ohio-516, ¶ 407; *see also State v. Tenace*, 6th Dist. Lucas No. L-00-1002, 2003-Ohio-3458, ¶ 175-185. In short, these claims fail for the same reasons as prior death-penalty challenges based on international law.

{¶ 121} Finally, in subpart 9, Kirkland presents a general challenge to the constitutionality of Ohio's death penalty. Because this claim is wholly conclusory, we summarily reject this argument. *Carter*, 89 Ohio St.3d at 607, 734 N.E.2d 345; *Jenkins*, 15 Ohio St.3d at 179, 473 N.E.2d 264.

{¶ 122} For these reasons, we reject Kirkland's sixth proposition of law in its entirety.

7.      **Ohio's Jury Instructions** (Proposition of Law VII)

{¶ 123} Consistent with the definition set forth in R.C. 2901.05(E), the trial court instructed the jury that

[r]easonable doubt is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.

Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

Kirkland contends in his seventh proposition that the phrases "willing to act" and "firmly convinced" allowed the jury to convict based on a lower standard of proof, namely clear and convincing evidence, in violation of due process. And he alleges that the use of the phrase "moral evidence" allowed the jury to convict based on subjective moral decisions, rather than demanding proof beyond a reasonable doubt.

{¶ 124} We have repeatedly upheld the constitutionality of Ohio's reasonable-doubt instruction. *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 242; *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 145. The phrases "willing to act" and "firmly convinced" adequately convey the difficult concept of reasonable doubt, and they do not establish a lower, clear-and-convincing standard. *State v. Nabozny*, 54 Ohio St.2d 195, 201-203, 375 N.E.2d 784 (1978), citing *Holland v. United States*, 348 U.S. 121, 139-140, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

{¶ 125} This court has not specifically discussed the constitutionality of the phrase "moral evidence." *Compare State v. Frazier*, 8th Dist. Cuyahoga No. 62557, 1994 WL 50703 (Feb. 17, 1994), *with State v. Frazier*, 73 Ohio St.3d 323,

330, 652 N.E.2d 1000 (1995). However, the United States Supreme Court has considered the meaning of that phrase and concluded that the phrase "moral evidence" means the same thing as "beyond a reasonable doubt. *Victor v. Nebraska*, 511 U.S. 1, 10-12, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).

{¶ 126} Based upon *Victor*, we reject Kirkland's seventh proposition of law.

**8.** **Imposition of Costs on Indigent Defendants** (Proposition of Law VIII)

{¶ 127} In *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, we held that the imposition of court costs upon an indigent defendant does not violate the Equal Protection Clause. In a subsequent decision, this court held that "although costs in criminal cases are assessed at sentencing and are included in the sentencing entry, costs are not punishment." *State v. Threatt*, 108 Ohio St.3d 277, 2006-Ohio-905, 843 N.E.2d 164, ¶ 15. If the imposition of costs does not constitute "punishment," it cannot implicate constitutional prohibitions on cruel and unusual punishment.

{¶ 128} Kirkland asks the court to reconsider its rulings in *White* and *Threatt* but provides no compelling reason, such as an intervening change in United States Supreme Court precedent, to do so.

{¶ 129} Alternatively, Kirkland suggests that the court should stay the collection of costs. But the logic of *White* suggests no reason why felons should be exempt from payment of costs while they remain incarcerated.

{¶ 130} Accordingly, we reject Kirkland's eighth proposition of law.

**9.** **Insufficient Evidence of Attempted Rape and/or Aggravated Robbery** (Proposition of Law IX)

{¶ 131} Kirkland asserts that the state presented insufficient evidence to convict him of attempted rape or robbery in connection with the murder of Casonya C. At the close of the evidence, the defense moved for acquittal on these

charges. The trial court denied the motion and allowed all the charges to proceed to the jury.

{¶ 132} When reviewing a record for sufficiency, we must consider whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77; *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The court must view the evidence in the light most favorable to the prosecution and defer to the trier of fact on questions of credibility and the weight assigned to the evidence. *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 146.

*Aggravated Robbery*

{¶ 133} Count Four of the indictment charged Kirkland with aggravated murder and included an aggravated-robbery specification. "Aggravated robbery" means a theft offense in which the offender inflicts or attempts to inflict serious physical harm on another. R.C. 2911.01(A)(3).

{¶ 134} The state provided sufficient evidence to support the charge based on the fact that Casonya's backpack and cell phone were never located. Tania H. testified that Casonya always carried her book bag with her. Patricia C. testified that the book bag was missing. And Kirkland and Ra'Shaud B. agreed that Casonya was talking on her cell phone at the time she encountered Kirkland. These facts are sufficient evidence to sustain a conviction for aggravated robbery. *See State v. Davis*, 76 Ohio St.3d 107, 115-116, 666 N.E.2d 1099 (1996).[2]

*Attempted Rape*

{¶ 135} The relevant definition of rape is "engag[ing] in sexual conduct with another when the offender purposely compels the other person to submit by

---

[2] The state argues that "[p]hone records demonstrated the continued use of the phone after Casonya's death," thus suggesting that Kirkland had possession of the cell phone. However, police testified at trial only that the phone continued to give off a locational signal for about a week, but that there were no calls or texts made from the phone after Casonya disappeared.

force or threat of force." R.C. 2907.02(A)(2). A criminal attempt occurs when a person, "purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, * * * engage[s] in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A). We have likened Ohio's definition of attempt to that in the Model Penal Code, which requires that the offender not only intended to commit the completed offense, but also engaged in conduct constituting a substantial step toward completing the offense. *State v. Woods*, 48 Ohio St.2d 127, 132, 357 N.E.2d 1059 (1976), *overruled on other grounds, State v. Downs*, 51 Ohio St.2d 47, 364 N.E.2d 1140 (1977). "To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose." *Woods* at paragraph one of the syllabus.

{¶ 136} Kirkland confessed to killing Casonya after she rejected his offer of money "to talk." Any rational juror could have equated this offer with an offer of sex, and even Kirkland concedes "soliciting Casonya to have sex for hire" in his brief. Kirkland's description of the conversation with Casonya was replete with sexual innuendo. Kirkland told police that when he asked Casonya if she was old enough to smoke marijuana, she replied that "she was old enough to be doing a lot of things." According to Kirkland, he began arguing with Casonya about "girls playing games" and the "things that some women wouldn't do," and Casonya threw the money back at him.

{¶ 137} That Kirkland attacked Casonya *only after* she refused his sexual advances created a strong inference that he acted with a sexual purpose—that being, to forcibly compel from her what she had refused to give him. The physical evidence corroborated this purpose. Casonya's body was found in the woods, with nothing more than one sock, indicating that Kirkland transported her to a secluded area and forcibly undressed her. *See State v. Scudder*, 71 Ohio St.3d 263, 274-275, 643 N.E.2d 524 (1994) (finding that the location of the victim's

pants around her ankles and underwear at midthigh supported the conclusion that she was forcibly undressed); *State v. Biros*, 78 Ohio St.3d 426, 448, 678 N.E.2d 891 (1997) (the fact that the victim's sweater, pants, and undergarments were never found revealed the defendant's "concealment or destruction" of evidence and "consciousness of guilt" for purposes of proving attempted rape). Moreover, Kirkland burned Casonya's entire body so severely that her "pelvic area had almost been completely charred by fire," and so similarly to that of 13-year-old Esme K., whom he did confess to raping. This court has previously found that the "evisceration" of a victim's sexual organs can create a "reasonable inference" of an "attempt[] to conceal evidence of rape or attempted rape." *Id.* While there was no testimony about where the fire originated on Casonya's body, there was evidence that the burning of Esme's body originated in her pubic area. Kirkland's burning of Casonya revealed the consciousness of guilt.

{¶ 138} Viewing the evidence, including all permissible inferences, in favor of the state, we find that any rational trier of fact could conclude that Kirkland formed a purpose to forcibly rape Casonya and engaged in a course of conduct—i.e., grabbing, choking, transporting her to a secluded area, and undressing her—qualifying as a substantial step toward the completion of that crime.

{¶ 139} Accordingly, we overrule Kirkland's ninth proposition of law.

**10.** **Cumulative Error** (Proposition of Law X)

{¶ 140} In his tenth proposition of law, Kirkland argues that the court should reverse his conviction based on the doctrine of cumulative error. Under that doctrine, this court will reverse a conviction when the cumulative effect of errors deprives a defendant of a fair trial even though each of the instances of trial-court error does not individually constitute cause for reversal. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 223; *State v. DeMarco*, 31 Ohio St.3d 191, 196-197, 509 N.E.2d 1256 (1987). Cumulative

error does not apply in cases such as this one where any error in the trial court is curable through the court's independent review. *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48.

*Independent sentence evaluation*

{¶ 141} Having considered Kirkland's propositions of law, this court must now independently review Kirkland's death sentence. First, the court must review and independently weigh all facts and other evidence disclosed in the record, "and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate." R.C. 2929.05(A).

*Aggravating circumstances*

{¶ 142} The evidence at trial established beyond a reasonable doubt that Kirkland murdered Esme K., with the aggravating circumstance of murdering her while committing or attempting rape or aggravated robbery. The evidence also established beyond a reasonable doubt that he murdered Casonya C. with the aggravating circumstance of murdering her while committing or attempting aggravated robbery or rape.

{¶ 143} The jury also found an additional aggravating circumstance in connection with each murder, namely that the murders were part of a course of conduct.

*Mitigating evidence*

{¶ 144} Against these aggravating circumstances, this court must weigh the evidence in mitigation submitted by Kirkland.

{¶ 145} Kirkland called a single witness to testify in mitigation. Dr. Scott Bresler testified that he had performed an evaluation of Anthony Kirkland. He diagnosed Kirkland as having "an adjustment disorder with mixed emotional issues and conduct" as well as an antisocial personality disorder. Kirkland's

condition causes him to have trouble thinking as well as difficulty in emotions, interpersonal functioning, and impulse control. In lay terms, he is a psychopath.

{¶ 146} Dr. Bresler testified that the condition manifests in unlawful behaviors, a pattern of deceitfulness, impulsivity, irritability, extreme aggressiveness, reckless disregard for the safety of himself and others, "a consistent kind of irresponsibility over a life force," and lack of remorse. The problem manifests at an early age. Individuals appear to be genetically predisposed.

{¶ 147} At the same time, the circumstances of his upbringing played a role. Kirkland's biological father was alcohol-dependent and extremely violent toward Kirkland and his mother. Until his father left (when Kirkland was about nine or ten), Kirkland was often beaten by his father, often watched his father beat his mother, and was forced to watch his father rape his mother.

{¶ 148} By his early teens, Kirkland had engaged in extensive substance abuse. He often fought with other kids. He suffered from depression, for which he did not seek treatment until his adult years.

{¶ 149} Meanwhile, his mother remarried and got help for herself and some of the children, but not Kirkland, who was the oldest. As a result, his attachment to his family, which the forensic psychiatrist testified allows a person to adapt to the world and to live responsibly, was damaged. Throughout his adulthood, he formed no stable relationships, maintained no steady income, drank and took drugs, and, after his release from prison, became homeless. According to Dr. Bresler, Kirkland "cannot live responsibly in society ever."

{¶ 150} Dr. Bresler also testified that Kirkland was able to justify his crimes, with one exception: he cannot rationalize his killing of Esme K., and "so oftentimes when he talks about her he'll cry."

{¶ 151} Finally, Dr. Bresler stated that Kirkland would have a difficult time adjusting to life in prison, but prison can handle him, as shown by the fact that he had already spent 17 years in prison.

{¶ 152} This statement from Dr. Bresler was the first time the jury learned that Kirkland spent an extended period of time in jail. Kirkland went to prison in 1987 after murdering Leola Douglas and setting her on fire. And while he was incarcerated, he threatened various prison officials and staff.

{¶ 153} Finally, Dr. Bresler testified on cross-examination that Kirkland's sisters were sexually abused by their father, and also by Kirkland himself when he was 13.

{¶ 154} Kirkland made a brief unsworn statement to the jury. He accepted responsibility for the deaths of the four women. He said he "get[s] so angry and cannot stop [him]self," though he acknowledged that was no excuse. He expressed a desire to be locked away forever. "I cannot believe how horrible I am. I will never forgive—forget or rest or be at peace, nor should I." He said he confessed to the police because he wanted it to stop. And in conclusion, he told the jury: "I do not blame you if you kill me. I don't deserve to live, but please spare my life."

*Sentence evaluation*

{¶ 155} R.C. 2929.04(B)(7) provides that the court may consider as mitigation, in addition to other factors listed in the statute, "any other factors that are relevant to the issue of whether the offender should be sentenced to death." Kirkland has pointed to several facts that may have mitigating weight under division (B)(7):

{¶ 156} * His personality disorder: This court has traditionally accorded personality disorders some, but little, weight. *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 138; *Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, at ¶ 119.

{¶ 157} * His abusive childhood: The court accords some, but not decisive, weight to evidence that the defendant suffered an abusive childhood. *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 276; *Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, at ¶ 265.

{¶ 158} * His history of alcohol and drug abuse: A history of drug and alcohol abuse is entitled to weight in mitigation. *Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 108.

{¶ 159} * His confession and cooperation with police: A defendant's confession and cooperation with law enforcement are mitigating factors. *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 191. The mitigation value of Kirkland's confessions would usually receive little weight, given that he initially lied to police and tried to blame Esme K.'s murder on the fictitious Pedro. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 247. However, in the peculiar circumstances here, we believe Kirkland's confession is entitled to serious consideration because the information he voluntarily provided enabled the police to identify the body of Kimya Rolison and thus her family was able to learn what had happened to her.

{¶ 160} * Remorse: Apologies and expressions of remorse in an unsworn statement are given some mitigating weight. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 327. Although the transcript cannot capture his tone or affect, there is no question that Kirkland expressed a good deal of self-loathing in his unsworn statement.

{¶ 161} The sincerity of his remorse was a hotly contested issue. Dr. Bresler testified that Kirkland cried during their sessions when he talked about killing Esme K. Detective Hilbert, on the other hand, had the impression that when Kirkland cried during his police interviews, it was more out of self-regard than concern for the victims. Kirkland's allocution consisted of six simple words: "Offer an apology to the family." The statement is revealing: he apologized to the

*family*, singular, probably the family of Esme K. Whatever credit he is due for his remorse over killing Esme is offset by his apparent lack of remorse for the pain and suffering he caused his other victims and their families. His expressions of remorse are too infrequent, too ambiguous, and ultimately too self-serving to justify according them significant weight.

{¶ 162} * Mercy: The trial court gave some mitigating value to Kirkland's request for mercy in his unsworn statement. But mercy is not a mitigating factor. *State v. O'Neal*, 87 Ohio St.3d 402, 416, 721 N.E.2d 73 (2000).

{¶ 163} In *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 97-106, this court vacated a death sentence on the grounds that the aggravating circumstances of the offense did not outweigh the mitigating factors. The court afforded great weight to the tragic circumstances of Tenace's childhood. Both his parents were criminals and substance abusers, and they were neglectful and abusive to the children. *Id*. at ¶ 103. Tenace was sexually abused himself, including being sold by his mother for sexual services, and forced to watch the sexual abuse of his sister. *Id*. at ¶ 102. He was exposed to substance abuse by his mother and her boyfriends, who encouraged him to commit crimes. *Id*.

{¶ 164} In contrast, we declined to vacate the death sentence based on childhood circumstances in *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 206. Mundt's mother had eight children by four different fathers. *Id*. at ¶ 192. A children's protective agency removed Mundt from his mother's custody for one month when he was an infant. *Id*. And when he was approximately five years old, his mother voluntarily surrendered custody of her children because she was homeless. *Id*. However, this court concluded that Mundt's mitigation evidence "present[ed] nothing comparable to *Tenace*." *Id*. at ¶ 206.

**{¶ 165}** Kirkland's case falls somewhere between the extremes represented by *Tenace* and *Mundt*. The testimony of pervasive physical and sexual abuse in Kirkland's home exceeds anything alleged by Mundt. At the same time, it does not equate to the facts in *Tenace*. Kirkland was abused by one parent, his father, George Palmore. So unlike Tenace, Kirkland had one nonabusive parent in his life. Moreover, his father left the home when Kirkland was nine or ten years old, and there is no evidence that any abuse continued during his teen years when he lived with his mother. The fact that Kirkland is a psychopath from a dysfunctional home is tragic, but not sufficient to outweigh the aggravating circumstances of his crimes, even when coupled with the other mitigating factors identified above.

**{¶ 166}** We therefore affirm the sentence and, in doing so, reject Kirkland's contention that the aggravating circumstances did not outweigh the mitigating evidence.

### *Proportionality review*

**{¶ 167}** The second part of the court's independent review requires us to decide whether a sentence of death satisfies the requirement of proportionality. R.C. 2929.05(A) requires this court to "consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases."

**{¶ 168}** In *Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 265, this court affirmed the defendant's death sentence for aggravated murder in the course of committing a rape. The court has also affirmed death sentences in cases combining a course-of-conduct specification with a robbery-murder specification. *See Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, at ¶ 253, and cases cited therein. Therefore, we find that the sentence is appropriate.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL and KENNEDY, JJ., concur.

PFEIFER and LANZINGER, JJ., concur in part and dissent in part.

O'NEILL, J., dissents.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 169} Ohio continues to employ the death penalty as part of our criminal-justice punishment scheme, and Anthony Kirkland's predatory, brutal, and heinous crimes clearly qualify him for that ultimate penalty. The state had a seemingly airtight case against Kirkland, but overzealousness in both the guilt and punishment phases has tainted its efforts; this court will taint the law if we bless the state's actions. In regard to the penalty phase, I concur in Justice Lanzinger's opinion that Kirkland should be resentenced due to the prejudicial effects of prosecutorial misconduct. In regard to the guilt phase, I write separately to dissent from the majority's holding sustaining Kirkland's conviction on the attempted rape of Casonya C.

I

{¶ 170} I dissent from the majority's holding regarding the "other acts" evidence introduced at trial through the testimony of Kylah W. Kylah testified that when she was 13 years old, Kirkland had exposed himself to her and solicited sex from her. In my judgment, Evid.R. 404(B) should have precluded the admission of that testimony; also, its admission was unfairly prejudicial pursuant to Evid.R. 403.

{¶ 171} The state's theory is that Kirkland's September 26, 2007 offer to pay Kylah for a sex act is evidence that is admissible to prove that Kirkland attempted to rape Casonya over a year earlier, in May 2006. There is no doubt that the testimony regarding Kirkland's exposing himself to Kylah and offering to pay her for a sex act are revelatory. The acts show him to be an evil person who sexualizes underage girls and is willing to pay for sex. That is, the evidence demonstrates his *character*. The state admitted as much in its closing argument

when it told the jury that the kind of a man who would pay a girlfriend's child for sex acts is the kind of man who would rape Casonya:

First count, again, is a charge of attempted rape; that when he approached Casonya [C.] on that bridge, when he walked with her and when he offered her money, it was an act, it was an attempt to have sexual contact with her.

And, again, this is where the other acts testimony comes in. * * * This is a young girl [Kylah W.] that actually was the daughter of one of his girlfriends, but he sees her as he sees all women, as a sex object.

And what does he do, offers this little 13-year-old girl, whose mother actually is nice enough to let him live there from time to time, five dollars for, his words, to be the first to eat her out.

* * *

But he wants you to believe that when confronted by a stranger, a 14-year-old girl walking across the bridge, he offered her 20 dollars and it got up to 60 dollars to talk.

Well, I'm sure if this little girl was offered 60 dollars just to talk, she would have taken it, but something he said or did made her take that money, throw it back in this predator's face and knee him. Did she do that because he said let's talk, or did he say I want to have sex with you—

* * *

You look at his pattern. You look at what he does when he sees a woman. You see what's in his eyes. He sees sex. And he's

going to get it. He'll barter for it, he'll pay for it, but he's gonna get it.

We don't know if he was successful or not [in raping Casonya C.]. He did a pretty good job destroying it.

As demonstrated by the state's use of the evidence in closing argument, Kylah's testimony was not relevant to prove any consequential fact. Its only probative value was to show that Kirkland is a very bad person who would pay for sex with an underage girl, and therefore he *must* have raped Casonya.

{¶ 172} Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime, that is, to show that he acted in conformity with his bad character. *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975). Evid.R. 404(B) codifies the common law with respect to evidence of other acts of wrongdoing and is construed against admissibility. *State v. Lowe*, 69 Ohio St.3d 527, 530, 634 N.E.2d 616 (1994). The standard for determining the admissibility of such evidence is strict. *State v. Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682 (1988), paragraph one of the syllabus.

{¶ 173} Evid.R. 404(B) establishes when other-acts evidence is admissible:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, knowledge, identity, or absence of mistake or accident.

The majority rules that Kylah's testimony is admissible under Evid.R. 404(B) because Kirkland's act—soliciting Kylah—demonstrated that "he had a sexual intent and motive" for offering Casonya money. Majority opinion at ¶ 69. But Kirkland faces the death penalty for the death of Casonya not because he offered her money for a sex act but because he allegedly attempted to rape her before killing her. Intent to solicit sex is not the same thing as intent to compel sex. And murder committed in anger because a sexual advance has been refused is not the same crime as murder in the course of rape. The state needed to show, pursuant to Evid.R. 404(B), that the act of soliciting Kylah established a motive for the attempted rape of Casonya or that the act of soliciting Kylah established that Kirkland's intent was to rape Casonya. On the pivotal question of whether Kirkland attempted to rape Casonya, Kylah's testimony sheds no light. When Kylah rejected Kirkland's proposition, he did not rape her. He walked away. Thus, Kirkland's bad act shows no intent or motive regarding the crime at issue, and the testimony is not admissible under Evid.R. 404(B).

{¶ 174} Further, I would find Kylah's testimony inadmissible under Evid.R. 403 because its probative value is substantially outweighed by the danger of unfair prejudice. Because of the complete lack of corresponding operative facts between the behavior toward Kylah and the murder of Casonya, Kylah's testimony was of limited probative value. Kylah was the daughter of a friend of Kirkland, and he would sometimes stay with the family. Kirkland exposed himself to Kylah while she was in her bedroom, but then left the room. He returned with a note offering to pay her for a sex act and then left the room again. Finally, after again entering the room—while dressed—he put a five-dollar bill on her dresser and then left. Kirkland did not react violently when Kylah refused his offer.

{¶ 175} In contrast, Casonya was a stranger. The encounter between Kirkland and Casonya occurred randomly, in public, and at night. There is no

evidence that Kirkland solicited Casonya for sex or that Kirkland exposed himself to her. Finally, after offering money to Casonya, Kirkland responded with violence when she threw the money back at him. The question in this case is whether there was a rape at all. Kirkland's criminal but nonviolent activity with Kylah is being offered to show that a rape occurred. That is, a situation where no rape occurred is being used as evidence that a rape occurred. The evidence is thus of limited probative value.

{¶ 176} Kylah's testimony was undoubtedly prejudicial, even to a defendant as demonstrably repugnant as Kirkland. The majority mentions a newspaper article that it dared not quote because it is not in the record. The defense claims that it demonstrates prejudice. I will save the reader the trip to the Internet: Hamilton County Prosecutor Joe Deters told the Cincinnati Enquirer that Kylah's testimony was pivotal in Kirkland's conviction for the capital murder of Casonya:

> Deters wonders if the jury would have recommended the death sentence in the case involving Casonya without the girl's testimony.
>
> "I think it would have been a coin flip," Deters said. "There is no question she made the difference in Casonya's case."

Perry, *Deters: Teen's testimony could seal killer Anthony Kirkland's fate,* The Cincinnati Enquirer (March 31, 2010). Certainly, Prosecutor Deters was attempting to publicly recognize a young girl for her courage and may have overstated her importance in the case, but there can be no doubt that Kylah's testimony was highly prejudicial against Kirkland.

{¶ 177} Without question, evidence that a grown man sexually solicited and exposed himself to a girl he knew to be 13 years old is prejudicial. The

testimony was *unfairly* prejudicial because the state, by its own admission, used the testimony to convince the jury that Kirkland *must* have tried to rape Casonya. The state rested its entire opposition to Kirkland's Civ.R. 29 motion on Kylah's testimony: "Specifically in regard to the attempted rape on Casonya [C.], this last witness [Kylah] has shown there was a common scheme or plan."

{¶ 178} Because the other-acts testimony reflected on Kirkland's character, did not meet the requirements of Evid.R. 404(B), and was unfairly prejudicial under Evid.R. 403, I would find that Kirkland's first proposition of law has merit.

II

{¶ 179} Kirkland asserts in his ninth proposition of law that there was insufficient evidence to convict him of attempted rape in connection with the murder of Casonya C. At the close of the evidence, the defense made a Crim.R. 29 motion for acquittal on that charge. The trial court denied the motion and allowed all charges to proceed to the jury. I would find that there is insufficient evidence to convict Kirkland of attempted rape.

{¶ 180} When reviewing a record for sufficiency, the court must consider whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 77; *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The court must view the evidence in the light most favorable to the prosecution and defer to the trier of fact on questions of credibility and the weight to assign evidence. *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 146.

{¶ 181} The crime of rape is "engag[ing] in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). The crime of attempted rape is complete when an

offender purposely engages in conduct that, if successful, would constitute or result in the offense of rape. R.C. 2923.02(A). We have explained a "criminal attempt" as an act "constituting a substantial step in a course of conduct planned to culminate" in an offender's commission of the crime. *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976), at paragraph one of the syllabus. To constitute a "substantial step," the conduct must be strongly corroborative of the offender's purpose to commit the crime, thus directing attention to the offender's overt acts. *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, at ¶ 95.

{¶ 182} The element of force for purposes of proving the attempted rape of Casonya C. is obvious and indisputable. The question, then, is what overt acts were presented as evidence to prove that Kirkland attempted to compel sexual conduct. The police collected no physical evidence of rape from a rape kit, because the fire damage to Casonya's body, specifically her pelvic area, prevented the forensic pathologist from taking any specimens. And during his police interrogation, Kirkland repeatedly denied having sex with Casonya.

{¶ 183} The majority states that Kirkland's offer of money to Casonya "to talk" was an offer of sex. But without Kylah's testimony, the state had no evidence from which to conclude that the offer of money was for sexual services. And even if there were evidence that Kirkland offered Casonya money for sex, that evidence would not be probative of whether he attempted to rape her before he killed her.

{¶ 184} The majority points to physical evidence that it says is consistent with a sexual purpose behind the murder. Casonya was found naked save for a single sock. The state argues that that fact, standing alone, is sufficient to sustain the attempted-rape conviction. However, even in the cases cited by the majority, the naked condition of the body was not the sole evidence of sexual assault. *See*

*State v. Scudder*, 71 Ohio St.3d 263, 274-275, 643 N.E.2d 524 (1994); *State v. Biros*, 78 Ohio St.3d 426, 447-448, 678 N.E.2d 891 (1997).

{¶ 185} This court's holding in *State v. Heinish*, 50 Ohio St.3d 231, 553 N.E.2d 1026 (1990), suggests that the naked condition of the body, standing alone, is insufficient to sustain a conviction for aggravated rape. In *Heinish*, the murdered victim was found with her jeans partially unzipped and pulled down several inches from her hips. *Id*. at 232. Her shoes, jacket, and watch were missing, and there was no underwear on the body. There was also a saliva stain on the crotch of her jeans that, according to laboratory tests, was consistent with the defendant's. Despite this evidence, this court vacated Heinish's attempted-rape conviction, because "[e]vidence of finding the victim's body in the condition noted above does not allow the fact-finder to conclude beyond a reasonable doubt that an attempted rape has occurred." *Id*. at 239.

{¶ 186} The burning of Casonya's body, coupled with other-acts evidence concerning Kirkland's sexual assault of another victim, Esme K., presents a closer call. According to the state, Kirkland's intent to rape Casonya is evident from the fact that he raped Esme: "The stark similarities between the defendant's attack on Esme [K.], i.e., the beating, the vaginal burning, the nude body, are particularly relevant."

{¶ 187} When Kirkland burned the body of Esme K.—a girl we know he did rape—he started the fire in her pubic area. Based on that evidence, the state argues for an inference of rape of Casonya C. because the fire was started in or was concentrated in the vaginal area, which the state characterizes as an obvious attempt to destroy any evidence of rape.

{¶ 188} However, the record does not support the state's assertion that the fire was started in or concentrated on Casonya's vaginal area. Obinna Ugwu, M.D., a deputy coroner and forensic pathologist employed by the county, offered no testimony as to the origin point of the fire on Casonya's body. The only

opinion came from Elizabeth Murray, Ph.D., a forensic anthropology consultant. Dr. Murray testified that "[i]t looked like the center of the fire was at the center of the body." Dr. Murray was not asked to clarify whether, by "the center of the body," she meant the vaginal area or somewhere on the torso. However, it is clear in context that she meant the latter: she testified that the hands and forearms were most burned because they were likely folded across the body. Also, she noted that the legs were not as severely burned, suggesting again that she believed the fire began higher on the body. In fact, Casonya's legs were the only part of the body not substantially charred by the fire.

{¶ 189} Burning Casonya's body may well have been an attempt to destroy evidence of her murder, not to destroy evidence of an attempted rape. Kirkland burned the bodies of all four of his victims, not just Esme and Casonya. Ultimately, all the state was able to prove was that Kirkland destroyed the bodies of his victims, including the bodies of two victims who were not raped. The fact that he burned Casonya's body is not probative evidence of whether he attempted to rape her first.

{¶ 190} In summary, the state presented insufficient evidence of attempted rape, and I would therefore reverse Kirkland's conviction on that charge.

III

{¶ 191} In conclusion, I believe that the case should be remanded for resentencing without a consideration of the attempted rape of Casonya Crawford as an aggravating circumstance. The protections afforded by state law and our constitutions are only as meaningful as this court's willingness to recognize them.

———————————

**LANZINGER, J., concurring in part and dissenting in part.**

{¶ 192} I concur in the judgment affirming Kirkland's convictions. But because I believe that the prosecutorial misconduct in this case violated Kirkland's rights to due process, I respectfully dissent from the majority's

decision to affirm his death sentence and would remand the case for a new sentencing hearing pursuant to R.C. 2929.06(B).

{¶ 193} Although I agree with the majority's conclusion that "the prosecutor's closing argument prejudicially affected Kirkland's substantial rights," majority opinion at ¶ 83, I disagree with the majority's decision declining to remand the case for a new sentencing hearing. Our procedures for sentencing in capital cases charge two independent bodies with evaluating whether the death penalty is proper: the jury or a three-judge panel at the trial level and this court at the appellate level. In cases like this, where a jury has recommended a sentence of death, our independent review of a death sentence should occur only if proper sentencing-phase procedures were followed leading up to the jury's recommendation.

{¶ 194} While R.C. 2929.05(A) provides that we must conduct an independent evaluation of the death sentence, we should not conduct this evaluation when the sentence was recommended by a jury that was exposed to substantial and prejudicial prosecutorial misconduct. We have typically used our independent evaluation of the death sentence to correct errors of law by the trial court in its sentencing opinion. *See, e.g., State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 298; *State v. Fox*, 69 Ohio St.3d 183, 191, 631 N.E.2d 124 (1994). By declining to remand this case, the majority fails to preserve the unique role of the jury in capital cases.

{¶ 195} As noted in the majority opinion, a prosecutor's closing argument is prejudicial when it is "so inflammatory as to render the jury's decision a product solely of passion and prejudice." *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). The majority opinion cites repeated remarks by the prosecutor that meet this standard in this case, and it concludes that "the state's closing remarks in the penalty phase were improper and substantially prejudicial." Majority opinion at ¶ 96. This conclusion is borne out by the record.

**{¶ 196}** Because the prosecutorial misconduct in this case potentially rendered the jury's decision recommending death "a product solely of passion and prejudice," it cannot be cured by this court's independent review of the sentence. While our own evaluation can cure errors occurring during the penalty phase, it cannot cure an error that may have caused the jury to recommend a sentence that is solely a product of prejudice. The majority cites *State v. Mills*, 62 Ohio St.3d 357, 373-374, 582 N.E.2d 972 (1992). In *Mills*, however, there were far fewer instances of prosecutorial misconduct, and the defendant failed to object. Most significantly, we did not conclude that the state's actions were substantially prejudicial. Kirkland's case, on the other hand, is not a case in which offhand remarks by the prosecutor may have had a negligible effect. Here, the majority *has* concluded that the prosecutorial misconduct was substantially prejudicial. I do not believe that we can conduct an independent review of a death sentence that was not properly recommended, and I therefore would reverse the judgment and remand for a proper sentencing hearing.

**{¶ 197}** Reversing the judgment sentencing Kirkland to death would not mean that he has escaped the death penalty for his actions. Because this case would be remanded due to an error that occurred during the sentencing phase of the trial, Kirkland would still be eligible for the death penalty pursuant to R.C. 2929.06(B). Although the crimes Kirkland is alleged to have committed are horrific, due process requires that a jury be free from prejudice before recommending the death penalty. Due process, in my view, demands a reversal and remand for resentencing.

_____

**O'NEILL, J., dissenting**.

**{¶ 198}** As a justice and as a citizen, it is truly difficult in this case to separate personal outrage from clinical constitutional analysis. The latter, however, is required by my oath of office. Anthony Kirkland's actions were

monstrous—he must be punished and society must be vigilantly protected from him.  He deserves nothing less than life in prison without possibility of release, and the horror of his crimes certainly makes it easy to suggest that death is the only fit punishment for him.  But because the death penalty "is inherently both cruel and unusual," *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900, ¶ 2 (O'Neill, J., dissenting), I cannot accept that easy suggestion.  And because the majority's analysis results in a denial of the defendant's right to a fair jury trial, even if I believed that the death penalty could be constitutionally imposed, I would still be compelled to dissent in this case.

{¶ 199} The majority correctly concludes that the state's closing remarks in the penalty phase "were improper and substantially prejudicial."  Majority opinion at ¶ 96.  *Compare* Carter, *Harmless Error in the Penalty Phase of a Capital Case: A Doctrine Misunderstood and Misapplied*, 28 Ga.L.Rev. 125, 131, 134 (1993) (discussing harmless, as opposed to prejudicial, error).  But instead of reversing the sentence and remanding for a new sentencing hearing, the majority holds that our independent evaluation and approval of the capital sentence cured the errors in the penalty-phase proceedings.  I disagree.  This court has relied upon its independent review to "cure" trial-court penalty-phase deficiencies in preparing a written sentencing opinion, *State v. Gumm*, 73 Ohio St.3d 413, 424, 653 N.E.2d 253 (1995), allowing improper testimony from a state expert witness, *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 132, and giving erroneous jury instructions, *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 84.  Today, it holds that independent review of a sentence can also "cure" prejudicial penalty-phase prosecutorial misconduct that this court has repeatedly determined to be improper: arguing facts outside the record, arguing the subjective experiences of the victim, and arguing that the circumstances of the murder are themselves aggravating factors.  That holding, in my opinion, undermines the very foundation of the jury system in Ohio.  And it

does not comport with the Sixth Amendment to the United States Constitution, which in this context requires that the facts permitting the imposition of a death sentence must be found by a jury.

{¶ 200} In *Clemons v. Mississippi*, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), the United States Supreme Court held that it was permissible for the Mississippi Supreme Court to impose a sentence of death based on its independent reweighing of aggravating and mitigating circumstances after the state court struck down as unconstitutional one of the aggravating factors found by the jury. This court has recognized that Ohio's system for imposing and reviewing death sentences is analogous to the Mississippi system approved in *Clemons*. *See State v. Landrum,* 53 Ohio St.3d 107, 124, 559 N.E.2d 710 (1990).

{¶ 201} But in *Ring v. Arizona*, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court concluded that the Sixth Amendment right to a jury trial required that a jury, rather than a judge, find the presence of aggravating circumstances necessary for the imposition of the death penalty. The Supreme Court stated that "[t]he right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death." *Id.*

{¶ 202} When it is applied to this case, *Clemons*, standing alone, would compel the conclusion that this court does not violate the United States Constitution by "curing" prejudicial errors in the penalty phase of a death-penalty case by independently reviewing the death sentence. But I simply cannot accept the proposition that our independent review somehow comports with the Sixth Amendment right to have a jury weigh mitigating and aggravating circumstances. In my opinion, *Clemons* is inconsistent with the United States Supreme Court's pronouncement in *Ring,* because *Clemons* rests on a premise—"the Sixth Amendment does not require that a jury specify the aggravating factors that

permit the imposition of capital punishment, nor does it require jury sentencing, even where the sentence turns on specific findings of fact"—that *Ring* has shown to be faulty. (Citation omitted.) *Clemons* at 746. As *Ring* demonstrates, the Sixth Amendment requires *precisely* those things: "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' [and therefore] the Sixth Amendment requires that they be found by a jury." *Ring* at 609, quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494, 120 S.Ct. 2348, 147 L.E.2d 435 (2000), fn. 19. Moreover, in *Alleyne v. United States*, ___ U.S. ___, 133 S.Ct. 2151, 2155, 186 L.Ed.2d 314 (2013), the court concluded that any fact that increases the mandatory minimum punishment for a crime "is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *See also id.* at 2165-2166 (Sotomayor, J., concurring) (demonstrating how *Ring* compels the decision in *Alleyne*).

{¶ 203} In short, as one federal judge has observed, "[i]f a defendant has a right to have a jury find all the facts that make him eligible for the death penalty, he must also have the right to have a jury make the final determination that he actually will be sentenced to death." *Baston v. Bagley*, 420 F.3d 632, 639, fn.1 (6th Cir.2005) (Merritt, J., dissenting) (arguing that "*Ring* has overruled *Clemons*"). In light of *Apprendi, Ring,* and *Alleyne*, it seems obvious that *Clemons* is bad law that will someday be explicitly overruled. And given that this court has already concluded that the defendant's penalty-phase hearing was unfair, it compounds that unfairness for this court to simply reimpose the death penalty instead of remanding the case for a sentencing jury to make that determination.

{¶ 204} I have stated my belief that capital punishment itself is unconstitutional; with today's decision, the court plainly demonstrates that Ohio's system of imposing and reviewing death sentences is unconstitutional as well. Accordingly, I dissent.

_____

Joseph T. Deters, Hamilton County Prosecuting Attorney, and William E. Breyer, Chief Assistant Prosecuting Attorney, for appellee.

Herbert E. Freeman and Bruce K. Hust, for appellant.

_____