**[Cite as *State v. Hartnady*, 2021-Ohio-1914.]**

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

STATE OF OHIO,                            :

    Appellee,                            :        CASE NO. CA2020-07-040

                      :        O P I N I O N
   - vs -                     6/7/2021

                      :

JEFFREY A. HARTNADY,                  :

    Appellant.                            :

CRIMINAL APPEAL FROM CLERMONT COUNTY MUNICIPAL COURT
Case No. 2019 CRB 4486A

Mark J. Tekulve, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

Michela Huth, P.O. Box 17, Bolivar, Ohio 44612, for appellant

**PIPER, P.J.**

{¶1}    Appellant, Jeffrey Hartnady, appeals his convictions in the Clermont County Municipal Court for five counts of cruelty to animals.

{¶2}    The Clermont County Dog Warden, who is also a humane agent, began an investigation after receiving a complaint that animals housed on Hartnady's property were not being cared for properly.  Specifically, the complaint alleged that the animals were

lacking appropriate food, water, and shelter. The agent went to Hartnady's property where she observed two pigs with inadequate shelter and no food or water. The temperature that day was in the mid-nineties.

{¶3} The agent further observed several donkeys and horses that were emaciated with bones showing through the skin. Some animals had matted hair and others had excessively long hooves. The confined animals had no food and the only water to drink was contaminated with leaves and algae. Hay located elsewhere on the property was covered with mildew and was unsafe to use as feed.

{¶4} After securing a search warrant, the agent returned to the property with several officers. A humane agency volunteer accompanied the officers to aid in removing and rehousing the animals. The volunteer accepted several of the animals including the donkeys and horse. With time and proper care, the animals have shown significant improvement in their physical condition and responded positively to proper care.

{¶5} The agent filed 13 charges of animal cruelty based on her observations. Hartnady pled not guilty to all counts and the matter proceeded to a bench trial. Before the trial began, the state dismissed seven of the 13 charges, but proceeded on six of the charges specific to the two pigs, three donkeys, and a miniature horse.

{¶6} The trial court found Hartnady guilty on five of the six counts and sentenced him to a total of 180 days in jail, which the court suspended. The court also placed Hartnady on two years of community control and ordered that he not possess any livestock. The court also ordered forfeiture of the animals that had been confiscated. Hartnady now appeals his convictions, raising the following assignments of error. Because the two assignments of error are interrelated, we will address them together.

{¶7} Assignment of Error No. 1:

{¶8} THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY ON

- 2 -

CHARGE H (BLACK POT BELLY PIG) AND CHARGE I (PINK POT BELLY PIG) BECAUSE THOSE CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶9} Assignment of Error No. 2:

{¶10} THE TRIAL COURT ERRED IN ENTERING A FINDING OF GUILTY ON CHARGE A ("DONKEY WITH EXCESSIVELY LONG HOOVES"), CHARGE C ("SMALL DONKEY WITH MATTED COAT"), AND CHARGE L ("EMACIATED PONY/MINI HORSE) BECAUSE THOSE CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶11} Hartnady challenges his convictions for lack of sufficient evidence.

{¶12} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "When evaluating the sufficiency of the evidence, this court defers to the trier of fact regarding questions of credibility." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, ¶ 132.

{¶13} Regarding the pigs, Hartnady was convicted of cruelty to animals pursuant to R.C. 959.13(A)(2), which provides that no person shall:

> impound or confine an animal without affording it, during such confinement, access to shelter from wind, rain, snow, or excessive direct sunlight if it can reasonably be expected that the animals would otherwise become sick or in some other way suffer. * * * For the purpose of this section, shelter means a man-made enclosure, windbreak, sunshade, or natural windbreak or sunshade that is developed from the earth's

contour, tree development, or vegetation.

{¶14} Regarding the equine animals (horse and donkeys), Hartnady was convicted of cruelty to animals pursuant to R.C. 959.13(A)(1), which provides that no person shall "torture an animal, deprive one of necessary sustenance, unnecessarily or cruelly beat, needlessly mutilate or kill, or impound or confine an animal without supplying it during such confinement with a sufficient quantity of good wholesome food and water."

{¶15} The culpability required to support a violation of R.C. 959.13 is recklessness. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 20. As defined by R.C. 2901.22(C), a person acts recklessly "when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature."

{¶16} After reviewing the record and construing the evidence in a light most favorable to the prosecution, we find that Hartnady's convictions are supported by sufficient evidence.

{¶17} The state presented testimony from the county humane agent who investigated the allegations against Hartnady. The agent testified that she had worked with animals for approximately 25 years in various ways including as a groomer, kennel technician, and veterinary assistant. As a humane agent, the agent was also trained through the Ohio Police Officers Training Academy.

{¶18} The agent testified she received a complaint that animals in Hartnady's care were not being properly fed, watered, or sheltered. On the day the agent went to Hartnady's property, it was sunny and between 93-95 degrees. The agent observed two pigs, each in its own pen but adjacent to one another. The agent testified that neither pig had food nor water in its pen and that the pigs did not have shelter from rain or excessive sunlight. The agent testified as to why pigs must have access to food and water. Her testimony explained

that pigs need protection from the sun because they are hairless animals that easily "get sunburned, they can succumb to heat exhaustion, dehydration," and that "there are many things that can happen if there's no shelter from the elements."

{¶19} The agent testified that the shelter provided for the black pig was inadequate because its dilapidated roof was insufficient to protect the pig from the sun and that the doghouse provided for the pink pig was not adequate shelter for that pig because it was not large enough to accommodate the pig. While a photograph taken by the agent showed limited shade for one pig, the agent testified that the photograph was taken in the later afternoon, around 4:00 p.m., rather than when the sun was at the apex of its day arc with minimum shade protection from the heat.

{¶20} The agent further testified that she observed horses and donkeys on the same property, within the same enclosure. The agent testified that the horses and donkeys were not provided food and that their water was "green and full of leaves and algae." The agent explained that leaves in water can decompose and become "toxic," while the algae can attract parasites leaving the water unhealthy to drink.

{¶21} While the agent observed some hay bales near the enclosure, she testified that the hay was covered in mildew and that there was no grass within the enclosure on which the horses and donkeys could graze. The agent testified that even if the horses and donkeys had access to the mildewed hay, it would be an unhealthy food source because mildew can cause problems in the animals' digestive system and health issues such as colic.

{¶22} The agent testified that one of the miniature horses was "very emaciated" and that she could see the horse's spine and ribs. According to the agent's observations, the horse was also "listless." Regarding the donkeys, the agent testified that one was thin and unkempt, and had matted fur. The agent observed one donkey approach the leaf and algae

filled water and turn away rather than drink it. She also observed a donkey with overgrown hooves, which she testified is "extremely painful" for the animal. She testified that overgrown hooves could cause injury to the donkey's tendons and cause other "life long problems."

{¶23} The state then presented testimony from an expert in equine veterinarian medicine who works at an equine-exclusive veterinary practice that treats horses, donkeys, miniature horses, and zebras. The veterinarian testified that she examined the equine animals taken from Hartnady's property. The examination performed included assigning a body score between one and nine as established by the American Association of Equine Veterinary practitioners. The veterinarian testified that an ideal body score is between four and five.

{¶24} The veterinarian testified that the miniature horse had a body condition score of 1.5 out of nine and that it suffered from "severe muscle loss diffusely as well as all ribs were visible and there was no muscle on the hind quarters." The veterinarian explained that severe muscle loss diffusely means that the muscle loss was located "throughout the horse's entire body rather than it being allocated to one particular area" and that such diffusion is "almost always due to malnutrition of some sort." The same horse had a grade 4 (out of 5) heart murmur associated with "severe malnutrition." The horse also suffered from moderately overgrown feet and a mild skin irritation over its back due to exposure to the elements and an inability to seek proper shelter. The horse was small in stature, which the veterinarian attributed to "chronic malnutrition resulting in stunting of her growth."

{¶25} The veterinarian also testified that a small donkey also scored a 1.5 out of nine for body condition and suffered from muscle loss over his "top line in particular, his spine as well as his scapula, so his shoulder blades were easily visible and palpable." The donkey's hooves were moderately overgrown and he had "significant matted fur throughout

his entire body as well as moderate skin irritation due to that matted fur not allowing for proper oxygenation of the skin."

{¶26} The veterinarian testified that a score of 1.5 body condition would require several weeks or months of improper care. Such unhealthy conditions as observed would require time to occur.

{¶27} The veterinarian also testified about a miniature donkey who had a body condition score of 3.5. This donkey had "significant muscle loss over her top line as well as a pot belly indicating likely a parasite burden," as well as a grade 2 heart murmur. The veterinarian determined that this donkey was malnourished and required care for overgrown hooves.

{¶28} The veterinarian testified that horses and donkeys require constant access to clean water and food and that illness can occur from inadequate water supplies. She further testified that the animals need access to water free from debris and other contaminants such as algae. Furthermore, both donkeys and horses need access to food because they lack gall bladders and an inability to store bile. Thus, as a veterinarian, she recommends that horses and donkeys have "constant access to food and grazing, whether that be hay at all times or grass at all times." When asked whether mildewed hay would provide sufficient sustenance, she testified that it would not because it could cause "severe diseases that can be deadly. In particular in hay that is moldy we see presence of clostridium botulinum toxin which will kill the horse, even when treated it's almost always fatal."

{¶29} The state next presented testimony from the humane agency volunteer who cared for the animals. The volunteer, who is a retired police officer and retired Ohio Department of Natural Resources officer, testified that he has experience in rehabilitating animals and has been a longtime volunteer for the humane agency. He has worked

extensively with abandoned and neglected animals. The volunteer testified to the lack of food and clean water on the day he picked up the animals. He also looked for wet spots in the pigs' area where they could cool themselves, but found none despite the temperatures that week, which were averaging in the nineties.

{¶30} The volunteer also testified that when he first observed the miniature horse, its hair had not been cared for, it showed evidence of being dirty and matted, and that its backbone "stuck out of his body about an inch, hip bones were sticking out, ribs were sticking out and the attitude of the animal was poor." When asked to further explain the horse's attitude, he testified that the horse had "no enthusiasm" and "no spirit."

{¶31} The volunteer further testified that the donkey was "extremely covered" in matted clumps of hair and looked like it had not been "fed anything." However, since the animals have been in his care, they have significantly improved in both body and spirit. Specifically, the animals have gained weight and have learned to trust him over time.

{¶32} After viewing this evidence in a light most favorable to the prosecution, we find the evidence sufficient for each of Hartnady's convictions. While Hartnady argues that the trial court's findings of guilt were based upon impermissible inference stacking, we disagree. Instead, the state offered evidence through witness testimony that the pigs were denied necessary shelter to protect them from the sun. The trial court found credible the agent's testimony that one shelter was inadequate because of its size and one was inadequate because of its dilapidated roof. The testimony indicated that the pigs needed shelter from the sun because as hairless animals they are prone to dehydration, sunburn, and heat exhaustion.

{¶33} Hartnady's argument that the pigs suffered no actual harm due to lack of adequate shelter is meritless. The statute does not require the state to prove *actual harm* to an animal. The evidence in this case established that Hartnady acted recklessly in

confining the pigs in such a manner that they lacked adequate shelter from the sun and other elements. Moreover, the state's witnesses testified to the danger that sun exposure poses hairless animals such that it can "reasonably be expected" that the pigs would "become sick or in some other way suffer" from the lack of shelter required by R.C. 959.13(A)(2).

{¶34} Regarding the horses and donkeys, Hartnady testified in his own defense that he provided adequate food and water. However, the trial court found the state's witnesses to be more credible when they testified to the poor conditions that jeopardized the animals' well-being and resulted in harmful physical consequences.

{¶35} On appeal, Hartnady claims that the trial court engaged in impermissible inference stacking to connect the malnourishment of each animal to the lack of food and water at the time of the agent's investigation. However, the veterinarian testified that in her expert opinion, the animals were malnourished over time and that horses and donkeys require a constant food and water source. The evidence deduced at trial, not improper inference stacking, proves beyond a reasonable doubt that Hartnady confined the equine animals without supplying "a sufficient quantity of good wholesome food and water" as is required by the statute.

{¶36} After a full review of the record and after taking into consideration each of Hartnady's arguments on appeal, we find that any rational trier of fact could have found the essential elements of cruelty to animals proven beyond a reasonable doubt. As such, Hartnady's two assignments of error are overruled.

{¶37} Judgement affirmed.

S. POWELL and M. POWELL, JJ., concur.