[Cite as *York v. York*, 2022-Ohio-4733.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
MEIGS COUNTY

| | | |
|---|---|---|
| KAREN YORK, | : | Case No. 21CA5 |
| Petitioner-Appellant, | : | |
| v. | : | <u>DECISION AND JUDGMENT ENTRY</u> |
| GARY YORK, | : | **RELEASED: 12/21/2022** |
| Respondent-Appellee. | : | |

<u>APPEARANCES:</u>

Tracy S. Comisford, Granville, Ohio for Appellant.

Robert W. Bright, Middleport, Ohio for Appellee.

Wilkin, J.

{¶1} This is an appeal by petitioner-appellant, Karen York ("Karen"), from a Meigs County Court of Common Pleas judgment entry that denied her petition for a civil protection order ("CPO"). Karen asserts a single assignment of error: "The trial court erred in dismissing Karen's petition seeking a domestic violence civil protection order." Respondent-appellee, Gary York ("Gary") has filed a brief in response. After reviewing the parties' arguments, the record, and applicable law, we find that the trial court's judgment is not against the manifest weight of the evidence. Therefore, we affirm the trial court's judgment entry denying Karen's petition for a CPO.

BACKGROUND

{¶2} Gary and Karen were married for 37 years.  They have four children, three of whom testified in this case: Michael, Amber, and Kaitlyn.  All of the children are adults; however, Kaitlyn was a minor at the time of the events herein.  In June 2019, Gary and Karen divorced.  Yet, they continued to live together, until Gary decided to move in his new wife ("Jelly").  So, in November of 2019, Karen moved out of the marital home and into a trailer on a nearby property that she jointly owned with Gary, although in this decision we will refer to it as her property to avoid confusion.  Gary, Jelly, and Kaitlyn live in the parties' former marital home.

{¶3} On August 20, 2020, Karen filed a petition seeking a CPO against Gary, pursuant to R.C. 3113.31. The petition was dismissed and immediately refiled again on January 20, 2021.  The petition alleged that: (1) Gary blocked Karen's driveway for two hours, (2) during this incident Gary chambered a round in his pistol and then re-holstered it, (3) Gary asked Karen if she thought that her car window would protect her, (4) Gary turned off the electric to her home, (5) Gary threatened to shoot both her and her friend, Robert, (6) Gary placed a tracking device on Karen's vehicle, (7) Gary told her that a civil protection order is just a piece of paper and a bullet can go through paper, and (8) Gary would come over all hours of the day and night to her trailer.  The petition listed four cases against Gary that purportedly were pending at the time – menacing by stalking, abduction, disrupting public services, and domestic violence.

{¶4} On July 7, 2021, the trial court held a full hearing in which the court

heard testimony from Karen; Gary; their children Amber, Michael, Kaitlyn; and

Sergeant Donald Mohler of the Meigs County Sheriff's Office for the purpose of

determining whether there was sufficient evidence for the court to grant Karen's

petition.

{¶5} Prior to the questioning of the witnesses, counsel for Gary

represented to the court that the menacing by stalking, abduction, and disrupting

public services charges had all been dismissed, while a fourth-degree

misdemeanor domestic violence charge was set for an August trial.  The

following is summary of the testimony from each of the witnesses at the CPO

hearing.

A. Testimony

Karen

{¶6} Karen testified that from the date of their divorce until the summer of

2020 a "majority of the time" she and Gary "got along pretty good."  On June 27,

2020, she had a cookout that included her boyfriend, Robert, as well as some of

her children and grandchildren.  After the cookout, about midnight, Gary came

over to Karen's property on a four-wheeler ("ATV") and gave her some

documents, which may have included a bill and some tax papers.  He came back

again about 20 minutes later, but Karen could not remember why.  Karen claims

Gary was "agitated" both times.  He texted her four to six times that night after he

left about getting the taxes done. Gary then invited Karen to his Fourth of July

party.

{¶7} On June 27, 2020, Karen claimed that Gary threatened to shoot Robert, if Gary ever caught Robert on his property.  Because of the threat, Karen decided not to attend Gary's party.

{¶8} On July 4, 2020, the night of Gary's party, Karen claimed that Gary texted her numerous family pictures and stated that he had nothing to live for.  Because they were divorced living their own lives, Karen interpreted Gary's actions as he was contemplating suicide.

{¶9} Karen related that sometime in July 2020, she asked Gary to assist her in setting posts in order to construct a lean-to on her property.  Gary told Karen that he would be bringing his wife to help.  On the afternoon of July 31, 2020, Gary came to Karen's property to trim branches in preparation to install the posts for the lean-to.  Meanwhile, Karen was tearing down the old lean-to.  Karen testified: "something was said.  I don't know if I said must've said something about, you know, shooting his wife, I guess is what was said[.]"  However, Karen continued: "I never said anything like that, unless he made the comment first about, you know, the friend being on the property or, you know, he's threatened to shoot the friend and myself and himself before, um, so it . . . something like that was said, you know, he just he up and left."  After that exchange, Gary left "in kind of a huffy demeanor."  Karen never called law enforcement or sought a CPO at that time.

{¶10} Karen testified that after Gary left she gathered her two grandchildren, got in her car, and started to leave the property because of her concern over Gary's mood.  She had a loaded gun in the console of the car.

However, as she was headed down her driveway, Gary and his wife appeared in front of her on an ATV. Gary stepped off the ATV and to the side and he said "there she is (Jelly), do what you need to do." Karen understood Gary's statement to mean "that I was supposed to shoot her." Gary then returned to the ATV, sat on it for a moment, then got up and "put a round in his, um, firearm," then re-holstered it. Karen claimed that scared her and the grandchildren.

{¶11} Jelly then walked home, and Gary came to the window of Karen's vehicle, asked her to roll down the window to talk, but Karen refused. Gary then left the immediate area on foot for 10 or 15 minutes, but Karen could not tell whether he was still nearby or not.

{¶12} Karen testified that her daughter, Kaitlyn, then arrived on the "buggy," which is similar to an ATV, and parked it behind Gary's ATV. Karen claimed that Kaitlyn was also scared. Karen did not recall saying anything to Kaitlyn. Karen stated that she did not have cell service while sitting in the driveway.

{¶13} Her son, Michael, was next to show up. He got out of his vehicle, and spoke to Karen. Karen explained to Michael through the car window that she was trying to leave but Gary had parked the ATV in front of her car which blocked her exit.

{¶14} Karen estimated the ATV was about 3 feet wide, and her driveway was about 14.5 feet wide. However, she claimed that she could not drive around the ATV because there was a hillside on the left of the driveway, and trees and a

creek to the right. She did not feel comfortable driving on the hillside with her grandchildren in the car.

{¶15} After sitting in her car with her grandchildren in the driveway for quite some time, Gary moved both the ATV and buggy off the driveway and moved a tractor in their place. Eventually, after approximately two hours of sitting in the driveway, Karen opened her window slightly and Gary slid the tractor key through the window and told her to move the tractor. Karen claimed that she was afraid to get out and move the tractor. Gary returned to Karen's car, and she passed the tractor key out the window. Gary then moved the tractor, and Karen was able to leave. She complained to the sheriff's office that Gary had blocked her egress from her home and he "threatened me through the window and wanted to take me out to the back and…" Karen decided to stay with a friend for a few days.

{¶16} On August 3, 2020 Karen returned to her trailer. That night Gary came over to Karen's and brought "a bunch of stuff over from his residence that he didn't know what to do with" for her to go through. When asked how she could do this having just gone through such a harrowing occurrence, she explained that it had been her experience during their marriage that although Gary would get upset, he calmed down after a couple of days and be "pretty much back to normal." However, she claimed that "something was still different" about Gary. Karen and the children went through the things that Gary brought over. Karen described Gary as "very cordial, nice, um, good demeanor." While

he was there, Gary fixed the faucet in Karen's trailer.  Karen was in the trailer with the grandchildren while Gary was fixing the faucet.

{¶17} At some point during that day, one of the children spotted what appeared to be a tracking device on Karen's car.  Karen took the device to the Meigs County Sheriff's Office, which confirmed it was a tracking device.  Karen claimed that Gary drove past the sheriff's office while she was there.  The sheriff then arrested Gary and he was charged with menacing by stalking.

{¶18} When asked why she continued to have concerns regarding Gary and her safety, she testified that he drove the tractor within 12 feet of her car and stated "I don't know what he is or isn't going to do."  Karen maintained that Gary comes to her place but she does not go to his.  She believed his stalking would continue.  She stated that she did not feel safe going home because she "doesn't know what's going to happen," and has not stayed in her trailer since August 15th of last year.

Sergeant Mohler

{¶19} Sergeant Mohler of the Meigs County Sheriff's Office testified that on August 3, 2020, Karen came to the sheriff's office to report that Gary had placed a tracker on her vehicle.  He also testified that Karen claimed that Gary told her that a CPO is only paper and will not stop a bullet.  Upon inspection, Mohler found a device on Karen's vehicle that was labeled "Track I," which he believed was a tracking device.  He saw Gary drive by the office while Karen was there.  With the assistance of another deputy, they stopped Gary, who admitted

he had been tracking Karen.  Sergeant Mohler confiscated Gary's phone.  He later learned that the tracking device was linked to Gary's phone.

**{¶20}** Based on the tracking device and Gary's alleged statement to Karen that a CPO is just a piece of paper and it will not protect you, the state charged Gary with menacing by stalking and domestic violence.

**{¶21}** Mohler admitted that he did not acquire a recorded or written statement from anyone, and therefore it was a "he said, she said [case]."  He also testified that the tracking device alone was not a threat of bodily harm in and of itself.

Amber

**{¶22}** Amber is Karen and Gary's adult daughter.  Amber testified that on August 3, 2020 she was helping Karen go through clothes when Gary came over on an ATV with some things for Karen to sort through.  Her sister, Kaitlyn, and Karen's minor grandchildren were there as well.  Amber told her mother that Kaitlyn saw Gary place a tracking device on Karen's car.

Michael

**{¶23}** Michael is Karen and Gary's adult son.  Michael testified that on July 31, 2020 while he was fishing, his fiancé informed him of the situation at his mother's residence regarding Gary blocking Karen from leaving her driveway. When Michael arrived at the property, the tractor with the hay-mower attached was parked parallel to the road in Karen's driveway and Gary was on an ATV "across the road at the barn."  Karen was in her vehicle with her grandchildren,

which was about ten feet from the tractor.  Michael stated that with the tractor in its current location, Karen could not leave her driveway.

{¶24} Michael first spoke to Gary who told him to "mind my own business." He then spoke to Karen who informed him she was "scared."  But when asked on cross examination if he thought that Karen was scared for her life, he testified "A small part of me, yes.  But a bigger part of me no."

{¶25} He looked for the tractor keys but could not find them.  He also testified that one of the grandchildren was crying.  Michael then told Karen that he did not want to get involved and gave her two options: call law enforcement, or he could tow the tractor out of the way.  Michael was unaware that Karen did not have cell service.  Michael then left the property and went home without contacting law enforcement.  He testified that he "knew that [Karen] was ok."

Kaitlyn

{¶26} Kaitlyn is Karen and Gary's daughter.  At the time of these events she was a minor and resided with her father and his wife.  On July 31, 2020 she was helping Karen "tear down siding and stuff on the building" in order to construct the new lean-to.  Gary was also on Karen's property that day clearing brush in order to set posts for the new lean-to.  Gary left the property at some point that day because he was upset or rather he "looked upset."  Kaitlyn then testified that Karen told her to "get the f _ _ k off" her property because she (Karen) was upset at Gary.  So Kaitlyn went back to Gary's home.  After Kaitlyn spoke to Gary about the incident, he and his wife left on an ATV heading back to

talk to Karen. Shortly thereafter Kaitlyn followed Gary and his wife to Karen's property in the "buggy" which is a slightly larger ATV.

{¶27} Kaitlyn parked the buggy right behind Gary's ATV in the driveway. The ATV was not blocking the driveway. Karen could have passed the ATV on the right or left. Kaitlyn asserted that Gary was trying to talk to Karen, who was in her vehicle. Kaitlyn testified that Gary was asking why Karen had treated Kaitlyn so poorly earlier. Karen then "blared out" that she (Kaitlyn) and Gary's wife needed to leave her property. Gary then moved the ATV and buggy and put the tractor in its place, and then he left on the ATV with his wife. Gary was gone for about 15 minutes and then returned to Karen's trailer on the ATV.

{¶28} Kaitlyn testified that neither Karen, nor the grandchildren appeared to be upset. Kaitlyn also testified that she also was not upset. Then Gary slipped the tractor key through the window of Karen's vehicle and he headed for the woods. While Gary was in the woods, his wife and Karen were having a conversation in which they were "apologizing to each other."

{¶29} When Gary returned, he asked Karen for the key to the tractor. Karen tossed the key out of the window of her vehicle into a pile of leaves and weeds. After about ten minutes Kaitlyn found the key and Gary moved the tractor, and everyone "went our separate ways." Kaitlyn testified that Karen could have left at any time.

{¶30} Although she was unsure of the exact date, Kaitlyn next saw Gary and Karen several days later at Karen's trailer. They were going through boxes of family items that Gary had brought over from his house.

{¶31} Kaitlyn admitted that she and Karen have a "love hate relationship." She further maintained that she gets along better with her father because she is a "daddy's girl."

Gary

{¶32} Gary denied threatening Karen, including Karen's claim that he told her a CPO is merely a piece of paper and would not protect her.  He did state that Karen threatened to harm his wife.

{¶33} On July 31, 2020, Gary was clearing brush on Karen's property to allow the installation of the lean-to.  Also on the property that day were Karen, Amber, Kaitlyn, and the grandchildren.  Gary asked Karen if his wife (Jelly) could help, and claims that Karen responded: "don't bring her over here, I'll get my gun."  Gary then left on the ATV for home.

{¶34} Gary testified that after being home for a short while, Kaitlyn came in and was crying.  She told him that Karen had told her "to get the f_ _ k off her property."  Gary decided to go back to get to the "bottom of this," and left with his wife headed for Karen's property.  As he pulled into the driveway, Karen was pulling out and both stopped their vehicles.  Gary admitted that after he dismounted the ATV he chambered a round in his pistol, re-holstered it, and then went up to her vehicle and tried to talk to Karen.  Gary claimed that he was trying to resolve the issue of Karen demanding everyone to stay off her property when in fact they (Karen and Gary) owned it jointly.  He chambered the round in his pistol because Karen had previously threatened his wife.  Karen refused to talk to him so he went back and leaned on the ATV, and his wife attempted to talk to

Karen.  Gary further stated that Karen could have pulled her vehicle around him and the ATV.

{¶35} Eventually, Gary moved the ATV and replaced it with the tractor, claiming that he parked it on his side of the property to symbolize that he owned half of the property.  He admitted that it was childish to do so, but claims that he was not trying to block Karen from leaving.  Gary also believed that Karen could have driven around the tractor.  He then slid the key to the tractor in the window of Karen's car so she could move it.

{¶36} When Kaitlyn showed up, Gary took a walk in the woods.  When he got back his wife and Karen were finishing a discussion, and his wife told him that she and Karen had apologized to each other.  Gary asked Karen to give him back the tractor key, and he claims that she threw it into the weeds.  After the key was found, he moved the tractor.

{¶37} The next time Gary saw Karen was the following Monday, August 3, 2020.  He took her a check for his half of the property payment and some items from his house for her to go through.  He also fixed the water faucet in her trailer, which Karen had asked him to fix.

{¶38} Gary admitted that while he was there that day he placed a tracking device on Karen's vehicle.  He did so because Karen was not letting him see their grandchildren.  He wanted to track her car so he would know where the grandkids were.  He claimed that it was a mere coincidence that he passed by the sheriff's office at the time that Karen was there lodging her complaint about Gary placing the tracking device on her vehicle.

B. Trial Court's Decision

{¶39} On July 29, 2021, the trial court issued an entry that stated: "The Court finds, based upon the evidence presented and admitted, that [Karen] did not prove facts which would allow the Court to issue a domestic violence civil protection order.  The Court further finds that said Petition For Domestic Violence Civil Protection Order should be denied."  It is this judgment that Karen appeals.

ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN DISMISSING KAREN'S PETITION SEEKING
DOMESTIC VIOLENCE CIVIL PROTECTION ORDER

{¶40} Karen maintains that the trial court's decision denying her petition to issue a CPO pursuant to R.C. 3113.31(A)(1)(ii) was either against the manifest weight of the evidence, or was an abuse of its discretion.  She maintains that there is evidence that Gary's " 'pattern of conduct' [is] sufficient to satisfy R.C. 2903.211 [menacing by stalking], and entitle [Karen] to a [CPO] pursuant to R.C. 3113.31(A)(1)(a)(ii)." [12] In support of her argument, Karen cites the following specific testimony/evidence in her appellate brief: (1) Gary several times threatened to kill Karen's boyfriend, (2) Gary sent text messages to Karen suggesting he was suicidal raising concerns for her safety, (3) Gary's act of chambering a round in his firearm upon his arrival, (4) Karen's refusal to engage in a discussion in the driveway, (5) Gary's coming and going for two hours while Karen sat in her car in the driveway, (6) Gary replacing the ATVs with a larger tractor, (7) Gary placing a tracking device on Karen's vehicle, (8) Gary appeared at the Meigs County Sheriff's Office after Karen had arrived there to complain about the tracking device, (9) Gary's phone was "pinned" to the tracking device,

and (10) Karen testified that she decided to rent a place because she was concerned for her safety at home.

{¶41} Karen maintains that her actions of remaining in her car, not brandishing her firearm and, not attempting to go around the ATV or tractor, "were thoroughly responsible."

{¶42} In a separate argument, Karen asserts that Gary's placement of the tracking device on Karen's vehicle and his use of the device to track Karen, independent of the other facts, constitutes a pattern of conduct that satisfies R.C. 2903.211(A)(1), which in turn supports issuing a CPO pursuant to R.C. 3113.31(A)(1)(a)(ii). Therefore, she maintains the trial court's decision declining to issue the CPO was against the manifest weight of the evidence, or an abuse of its discretion.

{¶43} In response, Gary claims that our review permits us to reverse only if we find that the trial court abused its discretion in reaching its decision. Gary further maintains that Karen was required to prove that she was in "fear of imminent serious harm" or that Gary committed menacing by stalking as defined in R.C. 2903.211.

{¶44} Gary asserts that the trial court's judgment should be affirmed because Karen did not prove by a preponderance of the evidence that she was in imminent fear of physical harm. In support of this argument, Gary points out that (1) Karen wanted help from Gary installing a lean-to on July 31, 2020, (2) Karen wanted Gary to repair her water faucet on August 3, 2020 just days after the driveway incident, (3) Karen claimed that Gary threatened to shoot her six or

seven times, but she could not give specific dates, no one else heard the threats, she did not report any to law enforcement, or file for a CPO, and Gary denied ever threatening to shoot or physically harm Karen, (4) Karen admitted that she made some type of statement about killing Gary's wife that agitated Gary, (5) Kaitlyn testified that neither Gary's ATV nor the buggy were blocking the driveway so as to keep Karen from leaving, (6) Michael did not take any action such as calling 911 regarding the driveway incident, (7) Kaitlyn testified that neither she nor Karen were upset or crying during the driveway incident, and (8) Karen testified that during their 37 years of marriage Gary would become agitated and then settle down.

{¶45} Gary also maintains that his use of the tracking device to monitor Karen was not a pattern of conduct as defined in R.C. 2903.211(A)(1) which prohibits menacing by stalking.

LAW

A. Standard of Review

{¶46} Gary maintains that our standard of review is whether the trial court abused its discretion.  Karen on the other hand appears to be unsure whether it is an abuse of discretion or a manifest-weight-of-the-evidence review.  " 'Our standard of review upon a challenge to a CPO depends upon the nature of the challenge to the CPO.' "  *Wootten v. Culp*, 2017-Ohio-665, 85 N.E.3d 198, ¶ 8 (4th Dist.), quoting *Walters v. Walters,* 150 Ohio App.3d 287, 2002-Ohio-6455, 780 N.E.2d 1032, ¶ 9 (4th Dist.), citing *Gooderham v. Patterson,* 4th Dist. Gallia No. 99CA01, 1999 WL 1034472 (Nov. 9, 1999).  Like the instant case,

> [w]hen the issue is whether a CPO should have been issued at all, we must determine whether the trial court's finding that the petitioner has shown by the preponderance of the evidence that the petitioner or petitioner's family or household members are in danger of the domestic violence is against the manifest weight of the evidence.

*Martindale v. Martindale*, 2017-Ohio-9266, 102 N.E.3d 19, ¶ 15 (4th Dist.), citing *Wootten* at ¶ 18.

**{¶47}** In undertaking a manifest-weight-of-the-evidence review, "[w]e are guided by the presumption that the trial court's factual findings are correct because of the knowledge that the trial judge 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Henry v. Henry*, 4th Dist. Ross No. 4CA2781, 2005-Ohio-67, ¶ 14, quoting *Seasons Coal. Co. v. Cleveland*, 10 Ohio St.3d 77, 79, 461 N.E.2d 1273 (1984). "[W]e thus defer to the trier of fact on these issues[.]" *Wootten* at ¶ 20, citing *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132. And the trier of fact is free to believe all, part, or none of any witnesses' testimony. *Id.*, citing *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23.

**{¶48}** Under a manifest-weight-of-the-evidence review, "[a]n appellate court will not reverse a trial court's judgment so long as it is supported by any competent, credible evidence going to all of the essential elements of the case." *Bugg v. Fancher*, 4th Dist. Highland No. 6CA12, 2007-Ohio-2019, ¶ 9, citing *C.E. Morris Constr. Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978).

> Under this highly deferential standard of review, a reviewing court does not decide whether it would have come to the same conclusion as the trial court. Rather, we are required to uphold the judgment so long as the record, as a whole, contains some evidence from which the trier of fact could have reached its ultimate factual conclusions.

*Id.*, citing *Seasons Coal Co.*, 10 Ohio St.3d 77, 79, 461 N.E.2d 1273 (1984).

{¶49} Ultimately, a reviewing court should find a trial court's decision is against the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the decision. *Wootten* at ¶ 21, citing *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 330.

### B. Civil Protection Order

{¶50} R.C. 3113.31 (E)(1) authorizes a court to issue a CPO, which requires the trial court to "find that the petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." *Gooderham*, 4th Dist. Gallia No. 99 CA 01, 1999 WL 1034472, at *2 (Nov. 9, 1999), citing *Felton v. Felton*, 79 Ohio St.3d 34, 37, 679 N.E.2d 672, at paragraph two of the syllabus, citing R.C. 3113.31(D). In pertinent part, R.C. 3113.31(A)(1) defines "domestic violence" as "the occurrence of one or more of the following acts against a family or household member: * * * *committing a violation of section 2903.211 * * * of the Revised Code* [.]" (Emphasis added.)

{¶51} Karen alleges that Gary violated the elements of R.C. 2903.211, menacing by stalking, thereby justifying a CPO under R.C. 3113.31(E)(1).

Menacing by Stalking, R.C. 2903.211

**{¶52}** R.C. 2903.211(A)(1), states that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person."

1. Pattern Of Conduct

**{¶53}** R.C. 2903.211(D) states:

As used in this section:

(1) "Pattern of conduct" means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents, or two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents, directed at one or more persons employed by or belonging to the same corporation, association, or other organization. * * *."

**{¶54}** As explained in *Middletown v. Jones,* 167 Ohio App.3d 679, 2006-Ohio-3465, 856 N.E.2d 1003, ¶ 10 (12th Dist.),

Because the statute does not specifically state what constitutes incidents "closely related in time," whether the incidents in question were "closely related in time" should be resolved by the trier of fact "considering the evidence in the context of all the circumstances of the case." *State v. Honeycutt,* Montgomery App. No. 19004, 2002-Ohio-3490, 2002 WL 1438648, ¶ 26, citing *State v. Dario* (1995), 106 Ohio App.3d 232, 238, 665 N.E.2d 759. In determining what constitutes a pattern of conduct for purposes of R.C. 2903.211(D)(1), courts must take every action into consideration even if, as appellant argues, "some of the persons actions may not, in isolation, seem particularly threatening." *Guthrie v. Long,* Franklin App. No. 04AP-913, 2005–Ohio–1541, 2005 WL 737402, ¶ 12; *Miller v. Francisco,* Lake App. No.2002–L–097, 2003–Ohio–1978, 2003 WL 1904066, ¶ 11.

> [W]e will not substitute our judgment for that of the trier of facts, and hence, as the judgment of the trial court is supported by some competent, credible evidence going to all the essential elements of the case, we will not reverse as being against the manifest weight of the evidence.

*Green v. Marconi*, 11th Dist. Warren No. CA84-11-074, 1985 WL 7690, at *2 (Ohio Ct. App. July 29, 1985), citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St. 3d 77 (1984); *C. E. Morris Co. v. Foley Construction Co.*, 54 Ohio St. 2d 279 (1978).

### 2. Mental Distress

**{¶55}** R.C. 2903.211(D)(2) states:

> "Mental distress" means any of the following:
>
> (a) Any mental illness or condition that involves some temporary *substantial incapacity*;
>
> (b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

**{¶56}** Such " '[m]ental distress need not be incapacitating or debilitating.' " *A.V. v. McNichols*, 2019-Ohio-2180, 137 N.E.3d 534, ¶ 22 (4th Dist.), quoting *McKinley v. Kuhn*, 4th Dist. Hocking No. 10CA5, 2011-Ohio-134, ¶ 17. However, " 'mental distress for purposes of menacing by stalking is not mere mental stress or annoyance.' " *Kuhn*, at ¶ 17, quoting *Caban v. Ransome*, 7th Dist. Mahoning No. 08MA36, 2009-Ohio-1034, ¶ 29. Rather, an "[i]ncapacity [from a "mental illness"] is substantial if it has a significant impact upon the victim's daily life, such as causing a change in one's routine." *McNichols*, at ¶ 22, citing *Smith v. Wunsch,* 162 Ohio App.3d 21, 2005-Ohio-3498, 832 N.E.2d 757, ¶ 20 (4th Dist.).

{¶57} "[E]xpert testimony is not necessary to establish mental distress."
*Kuhn*, at ¶ 17, citing *Perry v. Joseph,* Franklin App. Nos. 07AP-359, 07AP-360,
and 07AP-361, 2008-Ohio-1107, at ¶ 8. "Instead trial court may rely on its
knowledge and experience in determining whether the petitioner suffered mental
distress.' " *Id.*, citing *Wunsch,* at ¶ 20.

### 3. Mens Rea

{¶58} The culpable mental state for the issuance of a CPO is "knowing."
A person acts knowingly when, regardless of his purpose, "he is aware that his
conduct will probably cause a certain result or will probably be of a certain
nature." R.C. 2901.22(B). "A person has knowledge of circumstances when he is
aware that such circumstances probably exist." *Id.* Therefore, "the issue is
whether the offender acts when he or she is aware that their conduct will
probably cause [the victim] mental distress[,] [or to believe that the offender will
cause the victim "physical harm"], regardless of whether it was [the offender's]
purpose to cause that result." *McNichols*, at ¶ 19, *see also* R.C. 2903.211(A)(1).

### ANALYSIS

{¶59} Before engaging in our analysis, we find it necessary to address the
trial court's entry denying Karen's petition for a CPO. Notably, it is devoid of
analysis of the evidence presented at the hearing. Instead, it merely concludes
that the evidence was insufficient to grant Karen's petition for a CPO. "[B]ecause
a lack of findings necessarily circumscribes appellate review, an appellate court
will generally presume the trial court applied the law correctly and affirm if there
is some basis in the record for doing so." *Law Office of Natalie F. Grubb v.*

*Bolan*, 11th Dist. Geauga No. 2010-G-2965, 2011-Ohio-4302, ¶ 26, citing *Fancher,* 4th Dist. No. 06CA12, 2007-Ohio-2019, at ¶ 10.  Thus, we must rely primarily upon the record for our review.

{¶60} We begin our analysis by recalling Karen's list of evidence that purportedly constitutes a "pattern of conduct" sufficient to satisfy the requirements of R.C. 2903.211: (1) Gary several times threatened to kill Karen's boyfriend, (2) Gary sent text messages to Karen suggesting he was suicidal raising concerns for her safety, (3) Gary's act of chambering a round in his firearm upon his arrival, (4) Karen's refusal to engage in a discussion in the driveway, (5) Gary's coming and going for two hours while Karen sat in her car in the driveway, (6) Gary replacing the ATVs with a larger tractor, (7) Gary placing a tracking device on Karen's vehicle, (8) Gary appeared at the Meigs County Sheriff's Office after Karen had arrived there to complain about the tracking device, (9) Gary's phone was "pinned" to the tracking device, and (10) Karen testified without challenge that due to safety concerns she decided to rent a place off the property where she had resided at the time of these events.

{¶61} The trial court was in the best position to evaluate the credibility of the witnesses.  In the matter at hand, Karen testified that she could not recall where many of Gary's threats occurred and she failed to report most of these threats to law enforcement.  Even accepting for the sake of argument that the threats were credible, some of Karen's actions and claims could be construed as being inconsistent with Gary knowing that he was causing her to believe he would physically harm her.  For example, despite recent, purported threatening

events, Karen asked, or at minimum permitted, Gary to help with certain tasks on her property on more than one occasion, i.e., he cleared brush on her property to construct the lean-to one day, and he repaired the faucet in her trailer on another.

{¶62} Moreover, there was testimony that contradicted Karen's testimony that Gary's actions caused her or another to fear for her safety. For example, during the driveway incident, she testified that the grandchildren were crying, and she was scared. However, several witnesses testified that the grandchildren were not crying, and Karen's son, Michael, when pressed, testified that he did not really believe that Karen was scared at that time.

{¶63} Additionally, testimony revealed that both Gary and Karen own firearms, both had a permit to carry a concealed weapon, and Gary typically carried his pistol with him most of the time. Consequently, Gary possessing his firearm on July 31 was not unusual. Further, after loading the round, Gary immediately re-holstered his pistol and did not remove it the remainder of the time that he was at Karen's property that day. Finally, Karen testified that Gary never tried to open the door to her vehicle or otherwise act in a violent manner toward Karen at that time.

{¶64} Lastly, it is undisputed that Gary placed a tracking device on Karen's vehicle that was paired with his phone and he drove by the sheriff's office while Karen was there. However, as Sergeant Mohler opined, using a

tracker might support a criminal stalking offense, but also admitted that the device alone is not a threat to cause bodily harm to a person.[1]

{¶65} Based on the totality of the evidence, we find that there is some evidence to support that Gary did not engage in a pattern of conduct that he knowingly caused Karen to believe that he would cause her physical harm. Therefore, we find that the trial court judgment's denying Karen's petition is not against the manifest weight of the evidence. Accordingly, we overrule Karen's sole assignment of error.

CONCLUSION

{¶66} Having overruled Karen's assignment of error, we affirm the judgment of the trial court denying Karen's petition for a CPO.

**JUDGMENT AFFIRMED.**

---

[1] In her petition for the CPO, Karen made no express claim, and presented no evidence that she suffered from "mental distress," including any "incapacity" or "mental illness" for purposes of a CPO. *See* R.C. 2903.211(D); *McNichols,* 137 N.E.3d 534, ¶ 22 (4th Dist.). Her appellate brief also makes no such allegations. Rather, her petition and brief pertain to a concern of physical harm from Gary. Nevertheless, we find the evidence that supports the trial court's denial of Karen's petition for a CPO on the basis that she was not in fear that Gary would physically harm her, also supports that she did not suffer any mental incapacity or illness.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Meigs County Court of Common Pleas to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Hess, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
Kristy S. Wilkin, Judge



**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**